# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

**(Cite as: 2006 WL 334532 (N.D.Cal.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
ONCOLOGY THERAPEUTICS NETWORK
CONNECTION, Plaintiff,
v.
VIRGINIA HEMATOLOGY ONCOLOGY PLLC,
a limited liability company; Ronald Poulin,
an individual, Defendants.
No. C 05-3033 WDB.

Feb. 10, 2006.
David J. Cook, Debra D. Lew, Robert J. Perkiss,
Cook Perkiss & Lew, San Francisco, CA, for
Plaintiff.

Douglas Kershaw Poulin, Timothy C. Williams, D.
Alexander Floum, Law Offices of Timothy C.
Williams, Walnut Creek, CA, for Defendants.

ORDER AND MEMORANDUM OPINION (I)
GRANTING DEFENDANTS' MOTION FOR
SUMMARY
JUDGMENT OF PLAINTIFF'S CLAIM FOR
BREACH OF PERSONAL GUARANTY AND (II)
DENYING
PLAINTIFF'S COUNTER MOTION FOR
SUMMARY JUDGMENT AND (III) GRANTING
PLAINTIFF'S
MOTION FOR LEAVE TO AMEND THE
COMPLAINT

WAYNE D. BRAZIL, Magistrate J.

*INTRODUCTION*
*1 For reasons we will explain in the pages that
follow, we hereby GRANT Ronald Poulin's Motion
for Summary Judgment on plaintiff's claim that he is
personally liable as a guarantor of the debts in issue
of Virginia Hematology Oncology ("Virginia

Hematology"). As stated in section I.E., we also
DENY plaintiff's "Counter Motion for Summary
Judgment." Simultaneously, we GRANT, on
conditions later specified, plaintiff's motion for
leave to amend and supplement its complaint.

Oncology Therapeutics Network ("OTN") sells
products used by health care providers in the
treatment of cancer patients. Virginia Hematology
is an entity whose members treat cancer patients.
Ronald Poulin is a physician at and "managing
member" of Virginia Hematology.

On January 25, 2002, Ronald Poulin signed a
contract titled "Credit Application and Agreement."
The Credit Application and Agreement ("CAA")
was a form provided by OTN. The form included
OTN's logo on the top left corner and "Oncology
Therapeutics Network Joint Venture, L.P. ('Seller')
Commercial Credit Agreement" was centered at the
top of the second page (back) of the agreement.
Among other things, the CAA provided Virginia
Hematology with a line of credit under which it
could purchase and receive oncology products and
pay for them at a later date (*e.g.*, after Virginia
Hematology received payment for the supplies from
a patient's insurer).

It is undisputed that OTN products were purchased
under the CAA and were shipped to Virginia
Hematology. It is also undisputed that, at some
point, Virginia Hematology began to fall behind in
its payments to OTN.

On June 30, 2005, in San Mateo, California,
plaintiff filed its Complaint for Goods Sold and
Delivered ("Complaint"). See, Defendants' Notice
of Removal, filed July 27, 2005, at Ex. B. Among
other things, OTN alleged that Virginia Hematology
has failed and refused to pay amounts owed under
the CAA. OTN also alleged that, by signing the
CAA, Dr. Poulin *personally guaranteed* Virginia
Hematology's debt and, therefore, that Dr. Poulin

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                              Page 2

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

was personally obligated to pay the amount owing.

On July 27, 2005, defendants removed plaintiff's action to federal court.

On December 16, 2005, Dr. Poulin filed his Motion for Summary Judgment ("Motion"). Dr. Poulin states that he signed the CAA as a representative of Virginia Hematology only and not in his individual capacity, and asks the Court to find that, as a matter of law, his signature on the CAA did not create a personal guaranty. Along with its Opposition to defendant's Motion, plaintiff presents a "counter motion" for summary adjudication.

On January 9, 2006, pursuant to a briefing schedule established by the Court, plaintiff filed its Motion for Leave to File First Amended Complaint ("Request to Amend"). Plaintiff seeks to add allegations that defendants engaged in fraudulent conveyances and allegations that Dr. Poulin is the alter ego of Virginia Hematology and/or that a second entity created by Dr. Poulin, VHO, PLLC ("VHO"), [FN1] is liable as Virginia Hematology's successor.

> FN1. Although the parties have referred to the entities as "VHO # 1" and "VHO # 2," for the sake of clarity, we refer to the original entity Virginia Hematology Oncology, PLLC, (VHO # 1), as "Virginia Hematology" throughout and refer to VHO, PLLC (VHO # 2) as "VHO" throughout.

*2 On February 1, 2006, the Court conducted a hearing in connection with Dr. Poulin's Motion for Summary Judgment and plaintiff's Request to Amend.

For the reasons stated below, the Court GRANTS defendant's Motion for Summary Judgment and DENIES plaintiff's "counter motion" for summary judgment. Subject to the conditions set forth, *infra*, the Court also GRANTS plaintiff's Request to Amend.

*DISCUSSION*

I. *Dr. Poulin's Motion for Summary Judgment*

A. *Standard on Summary Judgment*

To succeed on a motion for summary judgment, the moving party must establish that, under facts that are not subject to genuine dispute, that party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c). In reviewing a motion for summary judgment, the Court considers the evidence in the light most favorable to the party against whom the judgment is sought.

If, when we consider the evidence in the best possible light for plaintiff, the evidence is insufficient (as a matter of law) to support a finding by the trier of fact that plaintiff has proved all required elements of his claims we must grant the request for summary judgment.

In his Motion, Dr. Poulin argues that (1) collateral estoppel bars plaintiff from asserting that the language in the CAA creates a personal guaranty on behalf of the signatory, (2) pursuant to California contract law principles, the language of the CAA does *not* create a personal guaranty as a matter of law, and (3) even if the CAA had created a personal guaranty, Dr. Poulin has been exonerated from that debt by virtue of the fact that OTN and Virginia Hematology substantially modified the terms of the original agreement. We address defendant's arguments below.

B. *Collateral Estoppel Bars Plaintiff's Claim*

Dr. Poulin invokes the doctrine of "defensive collateral estoppel" and asks the Court to bar plaintiff's claim that the CAA created a personal guaranty on the ground that plaintiff previously litigated that identical claim against another litigant and lost. With defensive collateral estoppel, a defendant "seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another [party]." *Masson v. New Yorker Magazine*, 85 F.3d 1394 (9th Cir.1996). [FN2]

> FN2. In his Motion, Dr. Poulin

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 3

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

erroneously refers to "offensive collateral estoppel" which applies where a plaintiff seeks to use the doctrine against a defendant.

In order to invoke collateral estoppel "(1) the issue at stake must be identical to the one alleged in the prior litigation, (2) the issue must have been actually litigated in the prior litigation, and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action." *Clark v. Bear Stearns and Co.,* 966 F.2d 1318, 1320 (9th Cir.1992).

Dr. Poulin contends (1) that plaintiff was a party to an adversary claim before the bankruptcy court in *In re San Jose Medical Mngmt, Inc., (Vold v. San Jose Medical Mngmt., Inc., et al* ), C02-55527 JRG and C02-55528 JRG ("*Vold,*" ), (2) that, in that proceeding, plaintiff asserted that the identical language in an identical credit application created a personal guaranty by the signatory, Mr. Vold, (3) that the bankruptcy court ruled that the language in the Credit Application did not create a personal obligation, and (4) that the bankruptcy court's holding was a critical and necessary part of the bankruptcy court's judgment. Motion at 8-14. See also, Defendant's Request for Judicial Notice, filed December 16, 2005.

**\*3** Plaintiff counters by asserting that the facts before the *Vold* court were materially different than those before this Court and, therefore, that Dr. Poulin cannot demonstrate that the issue at stake in that litigation was "identical" to the issue presented here--a necessary prerequisite to invoking collateral estoppel. [FN3] See, Transcript of February 1, 2006, hearing. More specifically, plaintiff contends that it was essential to Judge Grube's opinion in *Vold* that Mr. Vold's position with the oncology provider in that case was as a "CFO" and that there was no indication he owned any share of the practice. Plaintiff also notes that Mr. Vold drew a line through part of the application and then attached the entity's credit information on a separate sheet, rather than writing the information in the spaces provided on the form. In contrast, Dr. Poulin is a physician at

the practice (and, therefore, the argument presumably goes, the practice is primarily for his benefit), Dr. Poulin owns a substantial portion, if not all, of Virginia Hematology, and Dr. Poulin did not draw a line through any of the form contract and attach Virginia Hematology's credit information on a separate sheet.

> FN3. Defendant anticipated an argument from OTN that it was not actually a party to the *Vold* litigation. Motion at 12-13. Plaintiff made no such argument in its Opposition. We, therefore, assume OTN concedes that it was a party to the *Vold* litigation for these purposes.

As explained on the record, in the Court's view, the *Vold* court's opinion satisfies the requirements for asserting defensive collateral estoppel. As we read *Vold,* Judge Grube did *not* rely on evidence outside the language of the contract. Judge Grube reviewed the language of the *identical* sentence on which OTN relies in this case and, as we read his opinion, considered whether *this language, if unsupported by extrinsic evidence* that could sustain a finding that the parties mutually intended the signatory to be personally liable, creates a personal guaranty. [FN4] Judge Grube ruled that it did not.

> FN4. We have identified two sentences on the back of the contract that contribute to our finding of ambiguity that it appears Judge Grube did not consider. However, as explained, *infra,* these sentences are only marginally susceptible to plaintiff's proffered meaning, and we find them legally irrelevant for this analysis.

Judge Grube's opinion indicates that he relied on the language of the contract itself.
   The court [is] left to discern the meaning of the clause through the terms of the agreement itself.
RFJN at Ex. E (Grube Order) at 12.
   An examination of the extrinsic evidence offered in this case provides no support that OTN's interpretation is reasonable.
RFJN at Ex. E (Grube Order) at 10. See also, RFJN Ex. D at 6 ("the question of the guaranty

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                            Page 4

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

comes down to one sheet of paper, the credit application and agreement"). Statements made by Judge Grube at oral argument on the Vold motion provide further support for the conclusion that Judge Grube's reasoning encompassed *any agent* who would be authorized to sign on behalf of the entity. RFJN at Ex. D at 4. For these reasons, we conclude Judge Grube did not deem it material that Mr. Vold was a CFO, as opposed to an owner or managing director, or that Mr. Vold provided the information sought by OTN on a separate sheet rather than in the spaces set forth on the form.

The facts in *Vold* are in all material respects identical to those here. It was undisputed that. no communication had taken place regarding the nature of the CAA. RFJN (Grube Order) at Ex. E at 3 and 10. Mr. Vold signed the identical form contract Dr. Poulin signed. [FN5] Mr. Vold did *not* draw a line through the language that plaintiff contends created the personal guaranty and, just as with Dr. Poulin, that language immediately preceded Mr. Vold's signature. In our view, Judge Grube decided the *identical* issue that confronts this Court, whether, absent extrinsic evidence supporting personal liability, the language of the contract creates a personal guaranty by the signatory. See, section C, *infra*.

> FN5. The form in *Vold* and this case appear to be identical except for a change in the OTN logo.

*4 It is clear from the record that the *Vold* parties fully and fairly litigated the meaning of this language before Judge Grube. Additionally, whether the Credit Application created a personal guaranty by Mr. Vold was the sole issue before Judge Grube and, therefore, determination of the issue was "a critical and necessary part of [Judge Grube's] judgment."

We conclude that the *Vold* opinion satisfies the requirements of defensive collateral estoppel and that collateral estoppel, therefore, constitutes an independent and sufficient basis on which to GRANT defendant's motion.

In the next section we consider whether defendant has established an additional and separate ground for summary judgment by demonstrating that, as a matter of law, the CAA did not create a personal guaranty.

*C. The "Credit Application and Agreement" Does Not Create a Personal Guaranty*

Dr. Poulin asks the Court to find that there are no material facts subject to a genuine dispute and that, as a matter of law, the CAA does not create a personal guaranty by Dr. Poulin. Plaintiff, on the other hand, argues that the CAA must be interpreted to create a personal guaranty by Dr. Poulin and asks the Court to enter summary judgment in its favor.

The parties focus on the following language found immediately before the signature line at the bottom of the first page:

> The person signing below personally guarantees that Applicant will pay all amounts due under this Agreement and shall be responsible for such amounts being paid.

Poulin Decl., at Ex. A.

The contract provides that the "Agreement will be governed by and construed in accordance with the laws of the State of California." Poulin Decl., at Ex. A. Neither party disputes that California law governs interpretation of the contract. Under California law, in order to resolve the parties' dispute, we must determine whether it is objectively reasonable to conclude that the parties mutually intended to create a personal guaranty.

> In this state, ..., the intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this intention by determining what the parties meant by the words they used.

*Pacific Gas and Electric, Co., v. G.W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 38, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). "The precise meaning of any contract, ..., depends upon the parties' *expressed* intent, using an *objective* standard." *ASP Properties Group, v. Fard, Inc.*, 133 Cal.App.4th 1257, 1266, 35 Cal.Rptr.3d 343 (4th

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                          Page 5

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

**(Cite as: 2006 WL 334532 (N.D.Cal.))**

Dist.2005) emphasis added *quoting Golden West Baseball Co., v. City of Anaheim,* 25 Cal.App.4th 11, 31 Cal.Rptr.2d 378 (1994).

Where the parties disagree about the meaning of the contract, the Court construes the contract using a two step process.

First, the Court must determine *whether* the contract is "ambiguous." A contract is ambiguous when "it is 'reasonably susceptible' to either of the meanings urged by the parties." *Curry v. Moody,* 40 Cal.App.4th 1547, 1552, 48 Cal.Rptr.2d 627 (2nd Dist.1995). A contract may be ambiguous on its face, for example, where the language used therein is imprecise. However,

*5 [i]n making this determination, the court is not limited to the contract language itself but provisionally receives, without actually admitting, any extrinsic evidence offered by a party which is relevant to show the contract could or could not have a particular meaning.

*Curry,* 40 Cal.App.4th at 1552, 48 Cal.Rptr.2d 627 . [FN6] Whether the contract is "ambiguous" is a question of law. *Id.* If the language of the contract cannot *reasonably* be construed as a party suggests--even considering extrinsic evidence offered by the party--then the Court will find that the contract is *not* "ambiguous" and the inquiry is over.

> FN6. OTN suggests that the Court does not look to extrinsic evidence absent allegations of misrepresentation or fraud. Transcript of February 1, 2006, hearing. This contention is not supported by the cases. California case law clearly directs the Court to consider extrinsic evidence offered by a party to support the party's proffered meaning and/or assess ambiguity.

If, on the other hand, the Court finds that the contract is "reasonably susceptible to either of the meanings urged by the parties" then the Court "moves on to the second step which is to determine just what the parties intended the contract term to mean." *Curry,* 40 Cal.App.4th at 1552, 48 Cal.Rptr.2d 627.

In this second step, the Court admits the extrinsic evidence, if any, proffered by each party to aid in interpreting the contract. *ASP Properties,* 133 Cal.App.4th at 1266, 35 Cal.Rptr.3d 343. If the parties submit no extrinsic evidence, or if the material extrinsic evidence is not in conflict, the Court's construction of the contract is purely a question of law. *Id.* If, however, the evidence presents a genuine issue of *material* fact, that fact issue must be resolved by a jury before the Court can interpret the contract.

*1. The CAA is "ambiguous"*

Following California law, we first determine whether the CAA is "ambiguous." We find that it is--*i.e.,* that the CAA is reasonably susceptible to either of the meanings proffered by the parties.

When interpreting the potential meaning of the contract we may not consider the sentence on which the parties focus in isolation.

[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.

*Bank of the West v. Superior* Court, 2 Cal.4th 1254, 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992) (emphasis omitted) citing *Producers Dairy Delivery Co. v. Sentry Ins. Co.,* 41 Cal.3d 903, 226 Cal.Rptr. 558, 718 P.2d 920 (1986).

Plaintiff urges us to find that the parties intended that Dr. Poulin was personally guaranteeing Virginia Hematology's debt to OTN. Dr. Poulin, on the other hand, contends that the CAA can be understood only as a contract for credit between Virginia Hematology and OTN for the purchase of oncology supplies. According to Dr. Poulin, he did not personally guarantee Virginia Hematology's debt by signing the CAA.

At the hearing on February 1, 2006, the Court asked plaintiff to identify the bases for its position that Dr. Poulin personally guaranteed Virginia Hematology's debt. Plaintiff stated that the evidence in support of its position that Dr. Poulin personally guaranteed the debt consists of the language of the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

CAA. Transcript February 1, 2006, hearing. When asked whether plaintiff relied on any extrinsic evidence (*i.e.*, evidence outside the four corners of the contract) that the Court should consider for its position, plaintiff conceded that it did not. *Id.* Plaintiff added, however, that its position also was supported by the *absence* of evidence that Dr. Poulin communicated to OTN that he did *not* intend to personally guaranty the debt and by an "inference" created by an alleged "fact" about the way oncologists generally order oncology supplies. Without any competent evidentiary support, plaintiff contends that, as a matter of real-world fact, it is generally the physicians themselves, not their staffs or administrators associated with their practices, who place orders for oncology supplies. [FN7] Plaintiff argued that this alleged (but unsupported) "fact" supports an inference that Dr. Poulin was the primary beneficiary of the CAA. *Id.* As we shall explain, this alleged fact (even if true)--and this line of inferencing--are of no significance for the issues here.

> FN7. In support of its position plaintiff submitted the declarations of Kimberly Bergstrom and John Akscin. It is not clear that these declarants have reliable personal knowledge or that whatever information they do have is sufficient to support reliable generalizations about oncology practice nationwide.

*6 Because plaintiff relies almost entirely on the contract itself, we focus largely on the language of that contract. For reasons we explain in the next paragraphs, we find that the CAA is reasonably susceptible to the meaning Dr. Poulin proffers. We also conclude that it would not be transparently unreasonable to ascribe the meaning to the language of the contract that the plaintiff proffers. It follows that the language is ambiguous.

The critical sentence is poorly worded and could be read in two ways. We begin by quoting it in full. "The person signing below personally guarantees that Applicant will pay all amounts due under this Agreement and shall be responsible for such amount being paid." One rationally accessible

interpretation of this sentence is that the person who signs the document personally promises to see to it that the Applicant pays the money it owes. Under this reading, the "Authorized Person" is not making a personal guarantee at all--but making a promise to do everything he reasonably can to assure that the Applicant honors the commitments it makes pursuant to the terms of the Credit Application and Agreement.

There is a second rationally accessible interpretation of these words if we take into account only the words themselves and ignore the context, both textual and real-world, in which the words appear. Under this second interpretation, the person who signs as the "Authorized Person" accepts a personal obligation to pay out of his own funds the debts that the Applicant incurs under the Credit Application and Agreement if the Applicant for any reason fails to pay those debts. The source of this interpretation, of course, are the words "personally guarantees" and "be responsible for such amounts being paid."

In support of Dr. Poulin's interpretation, the sentence on which the parties focus is poorly worded, and, as written, it states that the signatory will "personally guarantee[ ] that *Applicant* [Virginia Hematology] *will pay* all amounts owed under this Agreement." Said another way, the language of the most important sentence (for these purposes) states that Dr. Poulin will ensure that *Virginia Hematology* pays its debt. How he would do that we do not know. The sentence does *not* state that the signatory personally guarantees *the debt.*

Additionally, we are required to consider the contract as a whole, and it is clear that the primary (if not entire) thrust of the CAA is to create a line of credit *on behalf of Virginia Hematology.* In that regard, the CAA contains *multiple* references to the fact that the agreement is "on behalf" of the entity Virginia Hematology, that the "Applicant" is the entity, and that the signatory is an "authorized *representative"* of the entity.

The agreement also is titled "Credit Application and Agreement." There is no indication in the title

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

of the agreement that a personal guaranty would be created.

Moreover, even if, under certain circumstances, California law permits one signature to bind both the entity and the individual, we find that the fact that there is only one signature line, that the CAA reads *"Authorized* Person's Signature" in front of that line, and that the CAA asks that authorized person to provide his or her *title* all undermine the argument that the parties intended to create two distinct sources of liability and support Dr. Poulin's position.

*7 In support of plaintiff's position, we acknowledge that, despite the fact that the sentence preceding Dr. Poulin's signature is poorly written it does contain the phrase "personally guarantees." Additionally, on the back of the contract under "Credit Investigation" it states, "[y]ou [which is defined as the "Applicant"] also authorize us to investigate the personal credit histories of authorized representatives of the business." Finally, under "Governing Law" the back of the contract states "Applicant *and* Authorized Person agree to personal jurisdiction in and by the State of California." Poulin Decl., at Ex. A emphasis added. Although none of the quoted statements *clearly* create a personal guaranty, if other evidence, rules of contract construction, or legal authority were to support that reading, we find that the three quoted statements are reasonably susceptible to the interpretation plaintiff urges. *Falkowski v. Imation Corp.,* 132 Cal.App.4th 499, 508-9, 33 Cal.Rptr.3d 724 (1st Dist.2005) (contract ambiguous where interpretation was plausible although "not a perfect fit").

We find that the contract is ambiguous on its face. Plaintiff, however, has not submitted extrinsic evidence that eliminates this ambiguity or that provides any meaningful support for plaintiff's interpretation. Dr. Poulin, by contrast, submits *extrinsic* evidence in support of his proffered meaning. In his declaration Dr. Poulin testifies that (1) he signed the CAA only as an authorized representative for Virginia Hematology, (2) that he never intended to personally guaranty the debt, and

(3) that there were no communications between himself and OTN about the CAA much less about a personal guaranty. Dr. Poulin notes that he wrote "Managing Member" next to his name when he signed the CAA and argues that this supports a finding that he had no intention of assuming responsibility for the debt in his individual capacity.

At this juncture, we must admit all the extrinsic evidence and proceed to determine whether plaintiff presents a genuine issue of material fact with respect to the parties' intentions as expressed in the terms of the contract or whether we interpret the contract as a matter of law.

2. *There Was No Mutual Intention to Create a Personal Guaranty*

At the outset, we must recognize that California law creates two presumptions in favor of a finding that the CAA did *not* create a personal guaranty by Dr. Poulin of Virginia Hematology's debt.

It is undisputed that, when he signed the CAA, Dr. Poulin was acting on behalf of Virginia Hematology and that plaintiff was aware that Dr. Poulin was acting on behalf of the entity. Plaintiff argues only that Dr. Poulin was *simultaneously* acting as an individual. California law employs a presumption that an agent of a disclosed principal does not bind himself individually absent clear evidence that the parties intended to do so.

Whether the agent of a disclosed principal binds himself depends upon the intention of the parties, which must be gathered from the facts and circumstances of each particular case. The *presumption* in such a case is that *it was the agent's intention* to bind his principal and *not to incur a personal liability;* and ordinarily the agent will not be personally bound except upon *clear and explicit evidence* of an intention to substitute or superadd his personal liability for or to that of the principal.

*8 *S.F. Heringer v. A.G. Schumacher,* 88 Cal.App. 349, 263 P. 550 (3d Dist.1928) emphasis added. [FN8]

FN8. *Heringer* goes on to say, "[b]ut it is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 8

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

the disclosed intention which governs, not any intention hidden in the mind of the agent, and accordingly the agent may render himself personally, liable, although this is contrary to his actual intention if he has in fact bound himself according to the terms of the contract." 88 Cal.App. at 353, 263 P. 550.
For the reasons stated in the text, we find that the "terms of the contract" do not bind Dr. Poulin personally.

Additionally, California provides that agreements to guaranty the debt of another are "strictly construed so as not to impose a burden not contained in or clearly inferable from the language of the contract." *Airlines Reporting Corp., v. U.S. Fidelity and Guaranty Co.,* 31 Cal.App.4th 1458, 37 Cal.Rptr.2d 563 (6th Dist.1995). *See also, U.D. Switzer v. A.F. Baker,* 95 Cal. 539, 30 P. 761 (1892) ("We cannot infer an agreement to pay the debt of another from such doubtful language.").

Given these two presumptions against the imposition of individual liability in circumstances such as these, to survive summary judgment plaintiff must proffer evidence from which a trier of fact reasonably could conclude that OTN had proven by "clear and explicit evidence" that both OTN and Dr. Poulin mutually intended to impose personal liability. We emphasize that California law requires that plaintiff demonstrate that that inference of mutual intent be *clear.* Plaintiff has presented no evidence from which an objective trier of fact could reasonably conclude that it is *clear* that this language, in context, was intended by *both* parties to impose a personal obligation on Dr. Poulin.

As noted, when interpreting what the parties intended by the words used in the contract, we must consider the contract as a whole as well as the circumstances surrounding its making--and not simply the language highlighted by the parties. Cal. Civ.Code § 1641. *See also, Heringer,* 88 Cal.App. at 353, 263 P. 550 ("if it can, upon the whole instrument, be collected that the true object and intent of it are to bind the principal and not to bind

the agent, courts of justice will adopt that construction of it, however informally it may be expressed").

Reading the CAA as a whole, we find that the contract leaves the overwhelming impression that "the true object and intent of it" was to create a line of credit for Virginia Hematology, to impose a duty only on the Applicant, Virginia Hematology, and that the signatory was acting only in his capacity as an "authorized representative" of that entity. *Heringer,* 88 Cal.App. at 353, 263 P. 550.

The contract is titled *"Credit Application* and Agreement" and the "Applicant" is clearly defined as Virginia Hematology. Poulin Decl., at Ex. A emphasis added. There is no reference to a "guaranty" *other than* the poorly worded sentence upon which plaintiff relies.

The first reference to the signatory reads, "[s]ignatory below represents he or she is a principal owner or an officer of the company *with authority to enter into this contractual agreement on behalf of* Applicant." Poulin Decl., at Ex. A (emphasis added). The next reference to the signatory states

[a]ny person signing below *on behalf of* a business entity attests that *the buyer is a valid business entity* and that such person is *authorized* to enter into this Agreement *on behalf of* the buyer. *By signing below,* Applicant agrees to the terms set forth in the Commercial Credit Agreement....

*9 Poulin Decl., at Ex. A emphasis added. These sentences clearly indicate that the signatory is signing as an agent *on behalf* of the Applicant entity and the signature is viewed as that of the Applicant.

Following these statements is the poorly written sentence which literally states that the signatory will "personally guarantee" that the *Applicant* pays its bills. This reading, although peculiar, is somewhat consistent with the prior statement that the signatory is "attesting" that the entity is a valid business. Following that sentence is a signature line. The contract consists of a form provided by *OTN,* and OTN's form contract provides only one signature

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                  Page 9

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

line. That signature line is preceded by the phrase, *"Authorized Person's Signature"* and is succeeded by a request for the signatory's *title.* This further supports a finding that the dominant import of the contract is that the signatory is signing as an agent on behalf of the entity.

In support of his position that he had no intent to be personally liable on the contract, Dr. Poulin points out that next to his name on the contract he wrote "Managing Member." While it is true that the placement by an agent of his title after his name does not necessarily prevent a finding that the agent is personally liable on the contract, the addition of "words *descriptio personae"* "is significant in connection with other facts." *Heringer,* 88 Cal.App. at 353, 263 P. 550. We note that, here, Dr. Poulin did not add his title arbitrarily. OTN specifically requested that he provide it, and the request was consistent with the prime import of the contract--*i.e.,* that the signatory had the authority under law to bind the Applicant. [FN9]

> FN9. Compare, *Sebastian Int'l, Inc. v. Peck,* 195 Cal.App.3d 803, 240 Cal.Rptr. 911 (2nd Dist.1987) (apart from the signature line the guaranty contained "no reference" to the agent's relationship with its principal).

Other than the word "personally" in one poorly drafted sentence, there is no indication on the front of the document that the signatory is acting in his *individual* capacity. Dr. Poulin could not reasonably have expected that he was obligating himself individually.

This theme that the signatory has signed on the Applicant's *behalf* is continued on the second page of the CAA. For example, the CAA defines "you" and "your" as "the *Applicant* that signs the Application *or on whose behalf* the Application is signed." Plaintiff contends that the CAA defines "you" and "your" as both the Applicant *and* the signatory. Opposition at 16. This is clearly not correct.

Moreover, if the parties intended to create a

personal guaranty of the debt one might expect there to be some reference to OTN's ability to seek payment from the guarantor in the section of the contract titled "Default/Collection Costs." There is none.

We have identified only two statements on the back of the contract that conceivably could support plaintiff's position. The first, the statement that the Applicant also authorizes OTN "to investigate the personal credit histories of authorized representatives of the business," does not clearly manifest an intention to create a personal guaranty. First, it again uses the phrase "authorized representatives" rather than "guarantor" or some other clear indication that OTN intends to refer to the signatory as an *individual.* Second, it obtains permission to investigate the credit history, not just of the signatory, but of multiple "authorized representatives." OTN cannot argue that authorized representatives other than Dr. Poulin, who did not sign the CAA, personally guaranteed the debt. Accordingly, this language does not clearly and explicitly evidence an intent to create a personal liability on behalf of the signatory. We also note, in defendant's favor, that OTN has not even contended that it conducted a credit check of Dr. Poulin personally.

*10 The second statement, "Applicant *and* authorized person agree to personal jurisdiction in and by the State of California" is insufficiently direct and explicit to overcome the presumption against creating personal liability on behalf of an agent. A statement on the back of a contract, near the end of a full page of "fine print," would have to expressly state that it was creating a personal guaranty and be highlighted visually in order to support a contention that an entity's agent was intending to accept personal liability for the entity's debt. We also note that this statement is not inconsistent with Dr. Poulin's position that there is no guaranty. If an entity's representative committed a tort, such as fraud, in connection with the contract, plaintiff could sue the signatory as an individual for his tort. *Heringer,* 88 Cal.App. at 353, 263 P. 550; Cal. Civ.Code § 2343(3). The request that the signatory subject himself to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 10

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

personal jurisdiction in California, therefore, is not rendered superfluous if we find that the CAA created no guaranty.

Absent extrinsic evidence to the contrary, the Court will adopt the interpretation that is "more consistent with the articulated purposes of [the contract]." *Cf., Falkowski,* 132 Cal.App.4th at 510, 33 Cal.Rptr.3d 724 (where neither party provided extrinsic evidence about intent, the court relied on the language of the contract, found both interpretations an imperfect fit, and adopted the construction that was more consistent with the overall purpose of the contract). One poorly written sentence above the signature line and two sentences whose specific purpose is unclear are insufficient to overcome the presumptions against imposition of personal liability in circumstances such as these recognized under California law.

Significantly, there is no extrinsic evidence in the record that could make OTN's interpretation objectively reasonable. Instead, the only relevant extrinsic evidence supports Dr. Poulin's contention that the parties' mutual intention was to impose an obligation only on Virginia Hematology.

Dr. Poulin submits his declaration in which he testifies that,

[a]t the time I signed the Credit Application, I believed it to be only an application for the extension of credit to [Virginia Hematology]. No other communication regarding the nature of the Credit Application was exchanged between myself and any representative of OTN.... I did not speak with any employee or agent of OTN regarding the Credit Application.... I never received any communication from OTN regarding the nature of the Credit Application and OTN's intent to secure a personal guarantee from me. In fact, I was not aware that OTN believed that it had a personal guarantee from me for [Virginia Hematology's] alleged debt until I received the summons and complaint from OTN. At no time was I made aware, told or informed that OTN sought my personal guarantee on the Credit Application. I never consented, at any time, either orally or in writing, to give OTN a

personal guarantee on [Virginia Hematology's] alleged debt to OTN or any other debt.
*11 Poulin Decl., at ¶¶ 14-20.

These unequivocal statements by Dr. Poulin are undisputed by plaintiff. Plaintiff does not present any evidence that any agent of OTN ever advised Dr. Poulin that OTN sought a personal guaranty or discussed the nature of the CAA with Dr. Poulin in any manner. [FN10] In fact, plaintiff submits no extrinsic evidence even that it was *OTN'* s intent to create a personal guaranty--much less that Dr. Poulin reasonably should have understood that OTN intended to do so. OTN neither submits evidence that it ever conducted an investigation of Dr. Poulin's personal credit prior to entering the CAA nor identifies any other acts or circumstances that would support a finding that OTN thought it was obtaining a personal guaranty.

FN10. The only declarant proffered by plaintiff who had any direct contact with Virginia Hematology or Dr. Poulin was Ms. Moore. Declaration of Allessaundra Moore in Opposition to Motion for Summary Judgment, filed January 9, 2006 ("Moore Decl."). Ms. Moore indicates that she had personal contact with defendants related to Virginia Hematology's account; however, most, if not all, of this contact seems to have occurred *after* Dr. Poulin signed the CAA. Plaintiff confirmed on the record that it knows of no evidence that the parties ever communicated about a personal guaranty.

Plaintiff argues that Dr. Poulin has submitted no evidence that he communicated his intention *not* to be personally liable. *Plaintiff* has the burden to establish, *clearly,* that the parties mutually intended to create a personal liability. It is not defendant's burden to prove a negative. Certainly defendant cannot be required to negate an obligation that is contrary to two presumptions of contract construction, not clearly supported by the contract

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                            Page 11

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

**(Cite as: 2006 WL 334532 (N.D.Cal.))**

language itself, and unsupported by extrinsic evidence. There is no genuine issue of material fact with respect to whether the parties discussed a personal guaranty in connection with the making of the CAA. They did not. No rational trier of fact could conclude that OTN *expressed* an intention that the sentence in the credit application would create a guaranty. OTN has provided no evidence that could support a finding that, in these circumstances, Dr. Poulin acquired some duty to actively communicate to OTN that he was *not* assuming a personal obligation. In order to create such a duty OTN would have had to take substantial steps to make it very clear to Dr. Poulin that the document he was signing not only created a credit account for Virginia Hematology, but also imposed a personal liability on himself.

To the extent that conduct subsequent to entry of the contract is relevant to determining the parties' intent at the time they entered the contract, we note that the evidence also is uncontradicted that at no time prior to the filing of this lawsuit--when OTN was discussing Virginia Hematology's rising upaid debt and negotiating payment plans signed by Dr. Poulin--did OTN indicate to Dr. Poulin that if Virginia Hematology did not pay its debts Dr. Poulin would have to pay them personally. Poulin Decl., at ¶ 18.

Plaintiff also argues that Dr. Poulin was primarily responsible for ordering the oncology supplies and that this supports a finding that the CAA was entered primarily for his benefit. First, plaintiff's contention that Dr. Poulin ordered the supplies is based on testimony of declarants without personal knowledge of the practices at Virginia Hematology and with no personal contact with Dr. Poulin. Second, Virginia Hematology has employed three physicians over its existence, at least one of whom was not an owner. Under plaintiff's logic, the CAA was equally for Dr. Saman's benefit during his tenure with Virginia Hematology. It would be irrational to use this "benefit" as a justification for imposing liability on Dr. Poulin, but not on Dr. Saman, simply because Dr. Poulin also was a representative of Virginia Hematology and, therefore, was authorized to sign the CAA. If an

agent other than Dr. Poulin had signed the CAA, Dr. Poulin (under plaintiff's theory) would still be responsible for ordering the supplies his patients need. Therefore, even if plaintiff's witnesses had personal knowledge that Dr. Poulin placed the orders for the oncology supplies, that fact would have no significant bearing on whether the CAA imposed liability on Dr. Poulin personally.

**\*12** Finally, we note that if, at this juncture, the ambiguity were not otherwise resolved, California rules of contract construction would require us to construe unresolved ambiguity against the drafter--in this case, OTN. *Tahoe Nat'l Bank v. Phillips,* 4 Cal.3d 11, 92 Cal.Rptr. 704, 480 P.2d 320 (1971).

We find that the facts material to determination of the parties' expressed intentions are undisputed. In light of the literal meaning of the relevant sentence as written, the overall purpose of the CAA, the repeated use of language in the CAA that indicates Dr. Poulin was operating as a representative of the entity and not an individual, undisputed extrinsic evidence that Dr. Poulin never intended to personally guarantee Virginia Hematology's debt, and undisputed extrinsic evidence that OTN never communicated its intention to create a personal guaranty and did not conduct a credit check of Dr. Poulin personally, we find that, as a matter of law, the CAA does *not* create a personal guaranty by Dr. Poulin.

D. *Were There Modifications to the Agreement That Exonerated Dr. Poulin from Any Obligation under the Credit Application?*

Because we grant defendant's motion and hold that, as a matter of law, the CAA does not create a personal guaranty by Dr. Poulin of Virginia Hematology's debts, we need not address this issue.

E. *Plaintiff's Counter Motion for Summary Judgment*

Although it was improperly presented, the Court considered plaintiff's counter motion for summary judgment on the merits. Plaintiff's motion is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 12

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

**(Cite as: 2006 WL 334532 (N.D.Cal.))**

DENIED for the reasons stated in section C, *supra.*

II. *Request for Leave to Amend the Complaint*

On January 9, 2006, plaintiff filed its request for leave to file an amended complaint containing allegations that, among other things, Dr. Poulin is the alter ego of Virginia Hematology and should be personally responsible for Virginia Hematology's debt on that basis. Plaintiff also seeks to add allegations that Dr. Poulin created a second entity, VHO, in order to avoid liability under the CAA. According to plaintiff, Dr. Poulin created VHO and fraudulently conveyed Virginia Hematology's assets to VHO--thus rendering Virginia Hematology judgment proof. Plaintiff also alleges that VHO is liable for Virginia Hematology's debt under the CAA as Virginia Hematology's successor. Plaintiff's request is governed by F.R.C.P. 15.[FN11]

> FN11. Plaintiff indicates that it is seeking to "supplement" its complaint pursuant to F.R.C.P. 15(d). Request to Amend at 6. Rule 15(d) is used to add allegations relating to facts that *occurred after* the filing of the original complaint. Most of the allegations in plaintiff's proposed First Amended Complaint pertain to conduct that took place *before* plaintiff filed the original complaint. Accordingly, plaintiff's request is primarily a request to amend under Rule 15(a).

Motions to amend the pleadings are liberally granted. F.R.C.P. 15(a) ( "leave shall be freely granted when justice so requires"); *U.S. v. Webb,* 655 F.2d 977, 979 (9th Cir.1981). In deciding whether justice requires granting leave to amend, the Court will consider factors such as the presence or absence of undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, and futility of the proposed amendment. *Webb,* 655 F.2d at 980.

Defendants oppose plaintiff's request.

For the reasons stated below, we GRANT plaintiff's Request *subject to the conditions* noted

below.

*13 We address defendants' objections and our conditions for amendment in the paragraphs that follow.

A. *Defendants Argue That Plaintiff Unduly Delayed*

Defendants complain that plaintiff knew that Dr. Poulin had created VHO before plaintiff filed the original complaint and, therefore, that OTN has unduly delayed in seeking to amend the complaint to add these allegations.

It is true Dr. Saman told OTN "that Dr. Poulin was changing his tax ID and also his name to VHO, PLLC" before plaintiff filed the original complaint. Moore Decl., at ¶ 17. However, OTN learned this information on June 23, 2005. *Id.* OTN filed the original complaint on June 30, 2005. The evidence indicates that OTN learned that Dr. Poulin might somehow be altering Virginia Hematology's corporate form only one week before it filed the original complaint. One week would not provide sufficient time to investigate and to identify possible causes of action related to the recently learned information.

Moreover, the primary purpose for denying leave to amend for undue delay is prejudice to the defendants. Defendants do not contend that allowing amendment at this juncture would be prejudicial. As of January 9, 2006, when plaintiff filed its Request to Amend, this action was only six months old, and the parties had conducted little, if any, discovery. Absent some particularized showing of prejudice, we decline to deny plaintiff's request on the ground that there was undue delay.

B. *Defendants Argue That Leave to Amend Is Inappropriate Where, as Here, a Motion for Summary Judgment Is Pending.*

According to defendants, when a motion for summary judgment is pending at the time plaintiff seeks leave to amend, the Court must deny plaintiff's Request to Amend unless plaintiff presents "substantial and convincing evidence"

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 13

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

supporting the proposed amendments. Alternatively, even if plaintiff is not required to present such evidence in support of its amendments, defendants argue that the fact that a motion for summary judgment is pending is a factor that weighs against granting leave to amend.

The Ninth Circuit has found it within the trial court's discretion to grant leave to amend after a motion for summary judgment has been filed. *Ferris v. Santa Clara County,* 891 F.2d 715 (9th Cir.1989) . However, district court cases within the Ninth Circuit do indicate that where there is a summary judgment motion pending, leave to amend may be denied when the plaintiff has not made a "substantial showing" to support the amendment. *Maldonado v. City of Oakland,* 2002 WL 826801, *4 (N.D.Cal.) citing Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial,* § 8:420.1 (2002 ed.).

We conclude that, *in this Circuit,* whether there is a summary judgment motion pending is a factor the Court may consider in assessing whether there has been undue delay and/or prejudice to the defendant. Typically, summary judgment motions are brought after the parties have substantially developed the case through discovery. Under those circumstances (which are *not* present here) the Court should take special care to ensure that plaintiff is not abusing the system and that defendants will not be unduly prejudiced.

*14 Plaintiff cites case law from the Seventh Circuit to the effect that a party seeking to amend after a motion for summary judgment is pending must present "substantial and convincing evidence" supporting the proposed amendments. We are not governed by the Seventh Circuit. Additionally, *Cowen v. Bank of United Texas,* 70 F.3d 937 (7th Cir.1995), the case on which defendants most heavily rely goes on to say that this "statement [is not] presented as a *rule* to confine the district court's discretion." *Cowen,* 70 F.3d 937 emphasis in original. *Carey v. Beans,* 500 F.Supp. 580, 582 (D.C.Pa., 1980), states that the purpose of this 'rule' is to prevent prejudice to the opposing party. In our view, cases in the Seventh Circuit are little more

than a directive to trial courts to more closely scrutinize whether amendment is appropriate after the parties have conducted a great deal of discovery and expended substantial resources developing the case as originally framed.

In the case before us, plaintiff notified the Court of its intention to amend the complaint *before* defendant filed his summary judgment motion. See, Transcript December 1, 2005, case management conference. This Court established a briefing schedule for this Request to Amend that would overlap with the briefing scheduling for defendant's Motion. This is not a case in which plaintiff saw defendant's motion for summary judgment, saw the "writing on the wall," and then sought to amend to circumvent the inevitable. Additionally, in this case, the value of defendant's Motion will not be undercut by the proposed amendments because our ruling that plaintiff cannot, as a matter of law, sustain its claim that the CAA created a personal guaranty by Dr. Poulin of Virginia Hematology's debts still stands and that claim must be amended. Plaintiff's proposed amendments do not affect our resolution of the merits of the motion for summary judgment.

Finally, the central concern of all these inquiries is prejudice to the defendants and, here, defendants have identified no prejudice.

*C. Defendants Argue That Addition of VHO Would Be Futile*

Before we address whether the addition of VHO as a defendant would be futile, we note that plaintiff has *not* directly named VHO as a party in the proposed First Amended Complaint. If plaintiff intends to sue VHO as the successor to Virginia Hematology, plaintiff must directly name VHO as a party to the case.

Defendants argue that it would be futile, in any event, to add VHO as a defendant because the Court cannot secure jurisdiction over VHO. According to defendants, plaintiff cannot demonstrate that VHO has minimum contacts in California sufficient to satisfy due process. Defendants have not addressed Ninth Circuit law on this issue.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 14

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

**(Cite as: 2006 WL 334532 (N.D.Cal.))**

In the Ninth Circuit, where plaintiff makes a *prima facie* showing of alter ego or agency, plaintiff can attribute the minimum contacts of one party to those of another in order to obtain personal jurisdiction over the second party. *Harris-Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.,* 328 F.3d 1122 (9th Cir.2003).

*15 It is well-established that a parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes....Two exceptions to that general rule exist, however-- a subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent.

To satisfy the alter ego exception ... the plaintiff must make out a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." ... The plaintiff must show that the parent exercises such control over the subsidiary so as to "render the latter the mere instrumentality of the former."

To satisfy the agency test, the plaintiff must make a prima facie showing that the subsidiary represents the parent corporation by performing services "sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] corporation ... would undertake to perform substantially similar services." ... The agency test permits the imputation of contacts where the subsidiary was "either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself."

*Harris-Rutsky,* 328 F.3d at 1134-35. [FN12] *Harris-Rutsky* also found that where the record is insufficiently developed for the Court to make this assessment, plaintiff may obtain jurisdictional discovery.

> FN12. Defendants argue that the law of Virginia, not California, governs plaintiff's alter ego claim. Because defendants have not addressed *Harris-Rutsky* they do not address whether it is nonetheless

appropriate to apply the California alter ego standard with respect to the jurisdictional question. However, as explained in section D.1 *infra,* we find, preliminarily, that the standard for finding alter ego and piercing the corporate veil in Virginia is essentially the same as the standard in California.

Although *Harris-Rutsky* involved a parent company and its subsidiary, we see no reason to limit the doctrine to that situation. *Accord, Las Palmas Assoc. v. Las Palmas Center Assoc.,* 235 Cal.App.3d 1220, 1 Cal.Rptr.2d 301 (2nd Dist 1992) (California courts will disregard the corporate form between sister corporations where its clear that those involved operate as one "single enterprise").

Plaintiff has not responded to defendants' argument that addition of VHO would be futile. See, Reply. Nonetheless, there is enough evidence suggestive of plaintiff's contention to permit plaintiff to plead that VHO is only a shell for taking over Virginia Hematology. Dr. Poulin essentially states that he created VHO as a shell for the continuation of Virginia Hematology in the event that Dr. Needleman created problems. "VHO ... was formed as the company through which proper patient care could continue should [Virginia Hematology] be deadlocked, be dissolved by Dr. Needleman, or otherwise compromised by Dr. Needleman." Poulin Second Decl., at ¶ 46.

There also is evidence in the record that, at this time, VHO has little or no operations and no office space apart from Virginia Hematology. Declaration of David J. Cook in Opposition to Motion for Summary Judgment, filed January 9, 2006, ("Cook Decl.") at Ex. C; Declaration of Ronald Poulin, filed January 17, 2006, at ¶ 49 ("Second Poulin Decl."). Although there is reason to think that Virginia Hematology assigned Dr. Saman's employment contract to VHO, Dr. Saman has left VHO (and/or Virginia Hematology), and there is no evidence in the record that VHO has treated any patients. Second Poulin Decl., at ¶ 18; Cook Decl., at Ex. D. In the lawsuit against Dr. Saman,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 15

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

defendants refer to VHO as an "affiliate" of
Virginia Hematology. Cook Decl., at Ex. D.

**\*16** Thus there is evidentiary and circumstantial
support for plaintiff's allegation that VHO is legally
indistinguishable (for purposes of this case) from
Virginia Hematology and possibly from Dr. Poulin.

In a separate section of their Opposition,
defendants argue that plaintiff cannot satisfy the
second alter ego requirement--a showing of
injustice. While the scope of this requirement is
somewhat unclear, plaintiff has alleged that
defendants have engaged in fraudulent conveyances
and that Dr. Poulin has intentionally transferred
assets to VHO in an attempt to avoid Virginia
Hematology's contractual obligations to OTN.
Evidence in the record could support an inference
that defendants attempted to assign Dr. Saman's
employment contract to VHO and that at some point
Dr. Poulin "resigned" from Virginia Hematology,
although he now denies this. VHO was formed at a
time that Virginia Hematology allegedly owed large
sums to plaintiff--and there is reason to believe that
VHO always has been assetless and judgment proof.
In this setting, we would abuse our discretion if we
refused to permit plaintiff to plead that honoring the
formal separateness of Virginia Hematology and
VHO would result in an injustice.

It follows that we cannot conclude that this Court
could not assert jurisdiction over VHO. Plaintiff
must be permitted to plead that Virginia
Hematology's contacts with California should be
attributed to VHO.

**D.** *Defendants Argue That Addition of Plaintiff's
Alter Ego Claim Would Be Futile*

Defendants argue that plaintiff's proposed
amendments relating to alter ego are governed by
Virginia law, as opposed to California law, and that
the standard for demonstrating alter ego in Virginia
is more stringent than in California. [FN13]
Furthermore, according to defendants, plaintiff
cannot satisfy the standard in either state, and,
therefore, amendment would be futile regardless of
which state's law applies.

FN13. Defendants do not argue that
Virginia law applies to plaintiff's
fraudulent conveyances claim. Therefore,
we assume that defendants concede that
California law applies to that claim.

1. *Whose Law Applies to Plaintiff's Alter Ego
Claims?*

Defendants argue that Virginia law, not California
law, applies to plaintiff's alter ego claim(s).
Defendants cite a decision from Illinois applying
Illinois' choice of law rules. Defendants also cite a
California case that supports application of a
doctrine to the effect that the laws of the state in
which a corporation is incorporated should govern
that corporation's "internal affairs." Defendants do
not discuss *California's* choice of law rules.
Plaintiff completely fails to address defendants'
choice of law argument.

A federal court sitting in diversity applies the
choice of law rules of the forum state. *Liew v.
Official Receiver and Liquidator,* 685 F.2d 1192
(9th Cir.1982). Accordingly, we must analyze
defendants' choice of law argument under California
law. [FN14] The test crafted by California courts is
referred to as a "governmental interest" test. Under
this test, we first determine whether the competing
states' laws differ. If the laws of the competing
states do not differ, there is no harm to Virginia if
the Court applies California law and the inquiry is
over. If, on the other hand, the laws of the
competing states do differ, we identify which
interests, if any, of each state could be impaired if
we did not apply that state's laws. If both states have
interests that would be impaired if its laws were not
applied, we conduct an analysis of "comparative
impairment" to determine which state has the
greater interest in having its laws applied. *Liew,* 685
F.2d aat 1196.

FN14. The CAA contains a choice of law
provision for disputes relating to the
contract. No party argues that this
provision governs an alter ego claim.

**\*17** Defendants argue that the "internal affairs

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 16

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

doctrine" compels application of Virginia law. Opposition at 19 citing *State Farm Mut. Auto. Ins., Co. v. Superior Court,* 114 Cal.App.4th 434, 8 Cal.Rptr.3d 56 (2003). Pursuant to *State Farm,* the internal affairs doctrine is

> a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs--matters peculiar to relationships among or between the corporation and its current officers, directors, and shareholders--because otherwise a corporation could be faced with conflicting demands.
> "Internal affairs" include steps taken in the course of the original incorporation ... the adoption of by-laws, the issuance of corporate shares, the holding of directors' and shareholders' meetings, ... the declaration and payment of dividends and other distributions, charter amendments, mergers, consolidations, and reorganizations, the reclassification of shares and the purchase and redemption by the corporation of outstanding shares of its own stock.

*State Farm,* 114 Cal.App.4th at 442, 8 Cal.Rptr.3d 56. *State Farm* does not involve an effort by an *outsider* to pierce the corporate veil based on alter ego. Moreover, it is not clear to us that an "alter ego" claim such as that asserted by plaintiff involves "internal" affairs of the corporation, as opposed to affairs "external" to the corporation. See, Note, Piercing the Corporate Law Veil: the Alter Ego Doctrine Under Federal Common Law, 95 Harv. Law Rev. 853, 862-863 (1982) (suggesting corporate veil issue may be "external").

Most significantly, defendants have presented no authority for the position that the "internal affairs doctrine" *replaces* the traditional "governmental interest" test. Absent authority to the contrary, it is our view that the internal affairs doctrine is a product of the notion that a state has a substantial interest in governing the internal affairs of its corporations. Rather than replacing the traditional test, this doctrine simply relates to the second and third step of our analysis--where we would identify the competing state's interests and assess their relative weight. This conclusion is consistent with cases from our District Court (and those from other jurisdictions) that support a view that a state has a

"substantial interest in determining whether to pierce the corporate veil of one of its corporations." E.g., *Sunnyside Development Co., LLC v. Opsys, Ltd. et al,* 2005 WL 1876106, *3 (N.D.Cal.). We are aware of no Ninth Circuit or California cases directly discussing choice of law in an *alter ego* case.

Because neither party has adequately briefed the issue, we refrain from ruling at this time. We make a preliminary finding, however, that the standard applied to determine an alter ego claim appears to be essentially the same under California and Virginia law. Moreover, even if Virginia law is more stringent than California law on this subject, defendants have not persuaded us that plaintiff's allegations and/or the record are insufficient to meet that standard at the *pleading* stage.

*18 Both Virginia and California consider piercing the corporate veil to be an extraordinary remedy. *Sonora Diamond Corp., v. Superior Court,* 83 Cal.App.4th 523, 539, 99 Cal.Rptr.2d 824 (5th Dist.2000); *Dana v. 313 Freemason,* 266 Va. 491, 587 S.E.2d 548 (2003).

California courts state that there is no specific "litmus test" for identifying when an individual is the alter ego of an entity but that the facts must support two general requirements: (1) that there is such unity of interest and ownership that the separate personalities of the corporation and the individual (or the two corporations) no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice. *Mesler v. Bragg Mngmt Co.,* 39 Cal.3d 290, 216 Cal.Rptr. 443, 702 P.2d 601 (1985); *Sonora,* 83 Cal.App.4th at 538, 99 Cal.Rptr.2d 824.

California courts emphasize that the alter ego determination is very fact specific. Some of the factors that California courts consider when assessing whether there is the requisite "unity of interest" include: inadequate capitalization, commingling of funds and other assets, holding out by one entity that it is liable for the debts of the other, identical equitable ownership, use of the same offices and employees, use of one as a mere

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers. *VirtualMagic Asia, Inc., v. Fil-Cartoons, Inc.,* 99 Cal.App.4th 228, 245, 121 Cal.Rptr.2d 1 (4th Dist.2002). When sister corporations are involved California also recognizes the "single enterprise rule" and will disregard the corporate form between "sister" corporations where it is clear that the entities involved operate as one single enterprise. *Las Palmas Assoc.,* 235 Cal.App.3d 1220, 1 Cal.Rptr.2d 301.

Virginia courts have articulated their standard slightly differently. The test for alter ego in Virginia has required the court to find: (1) that the corporate entity was the alter ego, alias, stooge, or dummy of the individuals sought to be charged personally and (2) that the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime. *Wigand v. Wilkes and WHRO,* 2004 WL 1939074, *2 (Va. Cir. Ct.). Defendants contend that the test in Virginia is more stringent than the test in California and, more specifically, that in Virginia plaintiff must prove a "legal wrong" and that this means something stronger than "injustice." Opposition at 19-21. See also, *Spacenet, Inc. v. American Ag. Comm. Systems, Inc.,* 2005 WL 3416644 (E.D.Va.) ("it is mandatory that Plaintiff allege a wrong, fraud or crime"). Although the words "fraud" and "crime" are more precise than the term "injustice" found in the California standard, recent cases from the Virginia Supreme Court suggest that the standards are, in reality, the same. In 2003 the Virginia Supreme Court articulated the standard for finding alter ego this way: "[p]iercing the corporate veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice." *Dana,* 266 Va. 491, 587 S.E.2d 548; *C.F. Trust, Inc. v. First Flight Ltd Partnership,* 266 Va. 806 (2003). In these pronouncements the Virginia Supreme Court did not purport to change Virginia's standard. It appears that the court simply articulated a "short hand" for the standard already in use, indicating that the terms "fraud" and "crime" are examples of the more general term "injustice."

This "short hand" articulation is virtually identical to California's standard.

*19 Moreover, Virginia courts, like California courts, view the alter ego analysis as very fact specific. *Wigand,* 2004 WL 1939074, *2.

Defendants also argue that Virginia courts are less sympathetic than California courts to alter ego claims in contract cases, where the complaining party's risk was part of the bargain, than in tort cases where "third parties" are hurt. Defendants assert that Virginia courts require plaintiff in an alter ego action based on contract to demonstrate that the defendant(s) made a misrepresentation in connection with the contract. Opposition at 20 citing *Spacenet,* 2005 WL 3416644. *See also, Perpetual Real Estate Serv., v. Michaelson Properties, Inc.,* 974 F.2d 545 (4th Cir.1992).

Although we have not found California cases that articulate this exact point, California courts have stated that the "injustice" requirement is not satisfied by 'difficulty in collecting a debt.' *Sonora,* 83 Cal.App.4th at 539, 99 Cal.Rptr.2d 824; *VirtualMagic,* 99 Cal.App.4th at 245, 121 Cal.Rptr.2d 1. Instead, plaintiff must provide evidence of "bad faith." In our view, both Virginia and California will not pierce the corporate veil for a mere breach of contract. Instead, both states require some showing of bad faith or wrongdoing. We cannot say, at this juncture, that Virginia law is materially "more stringent" than California law.

Because the parties have not adequately briefed the issue and because it is our view that both states apply essentially the same standard, we do not address the second and third steps of California's choice of law analysis--what interests would be impaired and comparative impairment.

### 2. Has Plaintiff Alleged Elements and Facts That Would Support a Claim for Alter Ego?

Plaintiff's proposed amendments ask the Court to disregard the corporate form with respect to two relationships. Plaintiff argues that Dr. Poulin is the alter ego of Virginia Hematology and that VHO is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Page 18

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

the alter ego (successor) of Virginia Hematology. [FN15] We address the proposed allegations with respect to each.

> FN15. It is unclear whether plaintiff contends that VHO and Dr. Poulin are alter egos.

As previously stated, under both Virginia and California law there are two general requirements to satisfy an alter ego claim. First, plaintiff must allege facts that would support a finding that the "unity of interest and ownership is such that the separate personalities of the corporation and the individuals no longer exist." *Dana,* 266 Va. 491, 587 S.E.2d 548 (2003); *Mesler,* 39 Cal.2d 290, 246 P.2d 663 (1985). Second, plaintiff must allege facts that would support a finding that "adher[ing] to that separateness would work an injustice." *Id.*

Defendants argue that plaintiff has not alleged facts that would satisfy either requirement and that plaintiff cannot show the requisite "injustice" because difficulty collecting a debt does not satisfy that standard and plaintiff has alleged no "legal wrong." Plaintiff has not responded to defendants' argument.

This case is still at the pleading stage. In our view, plaintiff's proposed allegations and the record before us are sufficient, *at this stage,* to support amendment of the complaint.

*20 For the reasons stated in our discussion of whether the Court can obtain jurisdiction over VHO, the record more than adequately supports an allegation that Virginia Hematology and VHO are a "single enterprise" and, therefore, satisfies the "unity of interest" requirement as to VHO.

Although it is somewhat of a closer question with respect to Dr. Poulin we think the record and plaintiff's allegations are sufficient, at this stage, to support an inference of the requisite unity of interest between Dr. Poulin and Virginia Hematology. At this juncture, plaintiff merely has to allege a colorable claim. Plaintiff does not have to prove the claim. The allegations and the record arguably

support a finding that Virginia Hematology, VHO, and Dr. Poulin constitute a single enterprise directed by Dr. Poulin.

In their "Verified Bill of Complaint" in the *Saman* litigation, *defendants* state "Virginia Hematology Oncology, PLLC, assigned the [employment] Agreement to VHO, PLLC, an affiliated entity, in that *both corporations are controlled by Poulin,* both corporations have performed or do now perform specialty medical services ..., and *Poulin is an owner of both corporations."* Declaration of David J. Cook, Esq. in Support of [sic] Reply to Opposition to OTN's Motion for Leave to Amend Complaint, filed January 19, 2006, ("Second Cook Decl.") at Ex. C at 4.

Additionally, plaintiff alleges that Dr. Poulin created VHO and transferred Virginia Hematology's assets to it in order to avoid liability under the CAA. Evidence in the record could support a finding that VHO is nothing but a shell created by Dr. Poulin. Second Poulin Decl., at 40-49. The record also indicates that Dr. Poulin caused Dr. Saman's employment contract to be transferred from Virginia Hematology to VHO. Second Cook Decl., at Ex. C.

We further note that apparent inconsistencies between Dr. Poulin's representations in the *Saman* litigation and those in this case could create an inference that Dr. Poulin is engaged in conduct that is morally untoward. In the "assignment" of the Saman employment contract defendants state that "Dr. Poulin has informed [Virginia Hematology] of his intention to resign" and "without the revenues generated by Dr. Poulin, [Virginia Hematology] will not be able to perform its obligations to [Dr. Saman]." In contrast, in this litigation, Dr. Poulin testifies that he has not resigned from Virginia Hematology, that Virginia Hematology is fully operative and generates significant income, and that VHO is essentially non-operative.

Defendants next argue that plaintiff cannot allege the requisite level of "injustice" and, therefore, that amendment of the complaint is futile. According to defendants, the "injustice" that plaintiff alleges is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

Page 19

nothing more than "difficulty collecting a debt." As indicated, it appears neither Virginia nor California law would permit plaintiff to pierce the corporate veil for a mere breach of contract.

*21 Defendants misstate plaintiff's allegations. Plaintiff clearly alleges that Dr. Poulin, individually and/or on behalf of Virginia Hematology, and VHO have engaged in conduct motivated by bad faith and/or fraudulent intent. Plaintiff asserts that defendants have fraudulently transferred Virginia Hematology's assets, without its liabilities, to VHO in order to render Virginia Hematology judgment proof and evade its obligation to OTN but, at the same time, to enable Dr. Poulin to continue operating his/their oncology practice through VHO.

Again, the inconsistencies between Dr. Poulin's statements in the *Saman* litigation and those here, and the evidence that Dr. Saman's employment contract was transferred to VHO are sufficient, at the pleading stage, to support amendment of the complaint. Therefore, even if Virginia law requires some identifiable "legal wrong," plaintiff has adequately alleged it.

Accordingly, we find that plaintiff's proposed alter ego/successor liability allegations are not "futile."

E. *Miscellaneous Orders re Form of First Amended Complaint*

As stated on the record at the hearing, plaintiff's First Amended (and, if applicable, Supplemented) Complaint must (1) name every defendant *in the caption,* (2) for *each claim,* identify which defendant or defendants that claim runs against, and (3) for *each claim,* identify the capacity in which each defendant is being sued--*e.g.*, individually, as alter ego for Virginia Hematology, as successor in interest for Virginia Hematology, etc.

Additionally, Plaintiff's Proposed First Amended Complaint names "Doe defendants." The Ninth Circuit rejects the use of Doe defendants in diversity actions. *Fifty Assoc. v. Prudential Ins. Co. of America,* 446 F.2d 1187 (9th Cir.1970). Plaintiff has presented no reason to believe that other

potential defendants whom it is currently unable to identify exist. Although we grant plaintiff's request for leave to amend the complaint, we ORDER plaintiff to remove references to "Doe defendants" from the First Amended Complaint.

Finally, because we grant Dr. Poulin's Motion for Summary Judgment, plaintiff must remove its claim that Dr. Poulin personally guaranteed Virginia Hematology's debt under the CAA from the First Amended Complaint.

III. *Case Management Schedule*

By Tuesday, February 21, 2006, plaintiff must file with the Court and serve on defendants its First Amended (and, if appropriate) Supplemented Complaint.

By Monday, March 13, 2006, defendants must file with the Court and serve on plaintiff their responsive pleading.

The Court VACATES the previously entered stay of discovery.

As explained with more particularity on the record, by Friday, March 31, 2006, the parties must have informally exchanged all documents that evidence the amount of the debt incurred by defendants and must have met and conferred in person or via telephone to address any questions by either party about that evidence.

*22 On February 7, 2006, the Court referred this action to a Magistrate Judge for a settlement conference to be conducted in the first half of April 2006 or as soon thereafter as possible.

By Wednesday, April 20, 2006, the parties must file a jointly-submitted case management conference statement. The parties' joint statement must include, among other things, a detailed discovery and motion practice plan, proposed deadlines for completing discovery and hearing motions, and a proposed trial date.

On Monday, April 24, 2006, at 1:00 p.m., the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 20

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

(Cite as: 2006 WL 334532 (N.D.Cal.))

Court will conduct a case management conference.

### CONCLUSION
For the reasons stated above, the Court GRANTS defendant's Motion for Summary Judgment on plaintiff's claim that Dr. Poulin is personally liable as a guarantor of the debts in issue of Virginia Hematology Oncology. Judgment will be entered on plaintiff's claim for breach of a personal guaranty in favor of Ronald Poulin and against plaintiff, OTN.

The Court also GRANTS plaintiff's Request for leave to file a First Amended Complaint on the condition that (1) plaintiff directly names VHO as a party defendant, (2) plaintiff removes references to Doe defendants, (3) plaintiff removes its claim that Dr. Poulin personally guaranteed Virginia Hematology's debt, and (4) for each claim, plaintiff identifies every defendant that the claim runs against *and* the capacity in which each defendant is sued.

IT IS SO ORDERED AND ADJUDGED.

Not Reported in F.Supp.2d, 2006 WL 334532 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2006 WL 686483 (D.Colo.)

(Cite as: 2006 WL 686483 (D.Colo.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.
AST SPORTS SCIENCE, INC., Plaintiff,
v.
CLF DISTRIBUTION LIMITED, a British
corporation, Defendants.
No. 05-CV-01549-REBCBS.

March 16, 2006.
Aaron A. Garber, David Michael Miller, Kutner
Miller, PC, Denver, CO, for Plaintiff.

Kent Edward Eichstadt, Sean Michael McCurdy,
McCurdy & Eichstadt, PC, Denver, CO, for
Defendants.

ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS

BLACKBURN, J.

*1 The matter before me is defendants' Motion to
Dismiss [# 7], filed October 18, 2005. Because I
find that defendants lack sufficient contacts with
Colorado to justify the assumption of personal
jurisdiction over them in this forum, I grant the
motion. [FN1]

> FN1. I therefore do not address defendants'
> alternative arguments regarding whether
> Holiday is a proper party defendant to this
> action and whether plaintiff has failed to
> plead fraud with the particularity required
> by Fed.R.Civ.P. 9(b).

I. JURISDICTION
I have subject matter jurisdiction over this case
pursuant to 28 U.S.C. § 1332 (diversity of
citizenship).

II. STANDARD OF REVIEW
Defendants move to dismiss on the ground that
they do not have sufficient minimum contacts with
Colorado to warrant the exercise of personal
jurisdiction over them in this forum. The
assumption of personal jurisdiction over a
non-resident defendant in a diversity case involves a
two-step inquiry. First, the defendant must be
amenable to service of process under the forum
state's long-arm statute. *See Wenz v. Memery
Crystal,* 55 F.3d 1503, 1056-07 (10th Cir.1995);
*Dart International, Inc. v. Interactive Target
Systems, Inc.,* 877 F.Supp. 541, 543 (D.Colo.1995).
Second, the exercise of jurisdiction must comport
with due process. *Wenz,* 55 F.3d at 1507; *Custom
Vinyl Compounding Inc. v. Bushart & Associates,
Inc.,* 810 F.Supp. 285, 287 (D.Colo.1992). Because
the Colorado long-arm statute extends personal
jurisdiction within the state as far as the federal
constitutional requirements of due process permit,
*Keefe v. Kirschenbaum & Kirschenbaum, P.C.,* 40
P.3d 1267, 1270 (Colo.2002), the analysis collapses
into a single inquiry regarding whether the
requirements of due process are satisfied.

Due process for jurisdictional purposes consists of
two elements. First, the defendant must have
sufficient "minimum contacts" with the forum state.
*International Shoe Co. v. State of Washington,
Office of Unemployment Compensation &
Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 158,
90 L.Ed. 95 (1945); *Kuenzle v. HTM Sport-Und
Freizeitgeräte AG,* 102 F.3d 453, 455 (10th
Cir.1996). "Minimum contacts" may be analyzed in
terms of specific jurisdiction or general jurisdiction.
*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80
L.Ed.2d 404 (1984); *Trierweiler v. Croxton &
Trench Holding Corp.,* 90 F.3d 1523, 1532 (10th
Cir.1996). Specific jurisdiction exists when the
defendant's contacts with the forum state arise from,
or are directly related to, the plaintiff's cause of
action. *Burger King Corp. v. Rudzewicz,* 471 U.S.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                        Page 2

Not Reported in F.Supp.2d, 2006 WL 686483 (D.Colo.)

(Cite as: 2006 WL 686483 (D.Colo.))

462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985); *Kuenzle*, 102 F.3d at 455. General jurisdiction is proper when the defendant has other "continuous and systematic" contacts with the forum, even if those contacts are unrelated to the pending litigation. *Helicopteros Nacionales de Columbia*, 104 S.Ct. at 1872; *Trierweiler*, 90 F.3d at 1533.

I have discretion to resolve the motion on affidavits and other written material. *Behagen v. Amateur Basketball Association*, 744 F.2d 731, 733 (10th Cir.1984), *cert. denied*, 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985). Plaintiff has the burden to establish a *prima facie* case of personal jurisdiction. *Id.* I must accept the well-pleaded allegations of the complaint as true. *Wenz*, 55 F.3d at 1505; *Behagen*, 744 F.2d at 733. However, "plaintiff has the duty to support jurisdictional allegations in a complaint by competent proof of the supporting facts if the jurisdictional allegations are challenged by an appropriate pleading." *Pytlik v. Professional Resources, Ltd.*, 887 F.2d 1371, 1376 (10th Cir.1989).

### III. ANALYSIS

*2 Both plaintiff and defendant are in the business of selling health, nutritional, and vitamin products and supplements. Plaintiff is a Colorado corporation with its principal place of business in Golden, Colorado. Defendant CLF Distribution Limited ("CLF") is a corporation established under the laws of Great Britain, with its principal place of business in Wiltshire, Great Britain. Defendant Robin Holiday ("Holiday"), the president of CLF, is a citizen of Great Britain. Defendants have purchased various products over the years from plaintiff, which plaintiff has shipped to defendants in the United Kingdom. Plaintiff claims that defendants have failed to pay for products they received from plaintiff in 2002, 2004, and 2005, amounting to $194,259.27 plus interest. It has sued defendants for breach of book account/contract, breach of implied contract, quantum meruit/unjust enrichment, and fraud in the inducement.

Defendants move to dismiss for lack of personal jurisdiction over them in this forum. Plaintiff's

response attempts to make a case for personal jurisdiction under both the general and specific jurisdiction prongs of the due process analysis. Its evidence in support of its argument for general jurisdiction is patently inadequate. Putting aside the fact that the complaint contains no allegations from which it might be inferred that defendants have the type of "continuous and systematic" contacts with Colorado necessary to support general jurisdiction in this forum, the contacts on which plaintiff relies are clearly stale, occurring long before the transactions giving rise to this lawsuit were consummated. Although the court must account for defendants' contacts over a reasonable period of time, *see Haas v. A.M. King Industries, Inc.*, 28 F.Supp.2d 644, 648 (D.Utah 1998), I do not consider a time period so wholly attenuated to the events of this lawsuit to be a reasonable benchmark. The pertinent time frame is keyed to the date the complaint is filed. *See Cameron v. Group Voyagers, Inc.*, 308 F.Supp.2d 1232, 1240 (D.Colo.2004) (citing *United Phosphorus, Ltd. v. Angus Chemical Co.*, 43 F.Supp.2d 904, 910 (N.D.Ill.1999)); *Haas*, 28 F.Supp.2d at 648-49. Plaintiff cannot reach back to events that occurred, at the earliest, in the late 1990s to prove a case of general jurisdiction over defendants today. There being no evidence that defendants continue to have regular, ongoing contacts with the state of Colorado apart from the purchases giving rise to this lawsuit, plaintiff has failed to make a case for general jurisdiction over them.

A federal court may assume specific jurisdiction over a non-resident defendant where the defendant " 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." ' *Benally v. Amon Carter Museum of Western Art*, 858 F.2d 618, 625 (10th Cir.1988) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239-40, 2 L.Ed.2d 1283 (1958)). The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* (quoting *Burger King Corp.*, 105 S.Ct. at 2183 (internal citations and quotation marks

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2006 WL 686483 (D.Colo.)

(Cite as: 2006 WL 686483 (D.Colo.))

omitted)). The contacts with the forum state must be such that "it is foreseeable that the defendant should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Jurisdiction must be assessed with respect to contract and tort claims separately. *See Remick v. Manfredy,* 238 F.3d 248, 255-56 (3rd Cir.2001).

*3 "In a contract case, relevant factors for assessing minimum contacts include 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.' ' *Benton v. Cameco Corp.,* 375 F.3d 1070, 1077 (10th Cir.2004) (quoting *Burger King,* 105 S.Ct. at 2185), *cert. denied,* --- U.S. ---, 125 S.Ct. 1826, 161 L.Ed.2d 723 (2005). There appears to have been no overarching contract governing the parties' business relationship. [FN2] Nevertheless, to the extent the individual purchase orders may be construed as contracts, it is clear that a party does not subject itself to personal jurisdiction by the mere fact of contracting with a Colorado resident. *See SGI Air Holdings II LLC v. Novartis International,* 192 F.Supp.2d 1195, 1202 (D.Colo.2002). Because plaintiff has presented no evidence of the content of the purchase orders, other than its allegation that they were payable "net 60 days," I must conclude that the purchase orders did nothing more than require defendants to pay for the products once they were received. There is thus no evidence that the orders created an ongoing obligation or other "future consequences" such as might support a finding of minimum contacts. *See E.R. Callender Printing Co. v. District Court in and for Second Judicial District,* 182 Colo. 25, 510 P.2d 889, 890 (Colo.1973) (mere signing of purchase order to buy goods from Colorado merchant insufficient to create personal jurisdiction).

> FN2. Plaintiff cites to a 1999 distribution agreement between the parties that was to be governed by Colorado law, but there is no evidence that such an agreement was ever signed by either party. (*See* Def. Reply App., Exh. 2.)

With respect to the parties course of dealing,

plaintiff relies heavily on the fact that defendants ordered a sizeable amount of product from plaintiff on a regular, monthly basis from 1998 through 2005. However, the quantity and regularity of these sales is insufficient to demonstrate that defendants purposefully availed themselves of the privileges of transacting business in Colorado. It is the quality, rather than the quantity, of the contacts that controls the personal jurisdiction analysis. *See Continental American Corp. v. Camera Controls Corp.,* 692 F.2d 1309, 1314 (10th Cir.1982) ("It is fundamental that the mere quantum of contacts between the forum and the defendant is not determinative."). To the extent these sales were "negotiated," they were carried out via e-mail or facsimile between the parties, but those types of communications likewise are insufficient to confer jurisdiction over defendants. *See Far West Capital, Inc. v. Towne,* 46 F.3d 1071, 1077 (10th Cir.1995); *SGI Air Holdings,* 192 F.Supp.2d at 1203; *see also E.R. Callender Printing Co.,* 510 P.2d at 890. Under the circumstances, it seems defendants contractual contacts with Colorado are based on the mere fortuity that plaintiff has its offices here. That fact alone does not give this court personal jurisdiction over these non-resident defendants.

As regards plaintiff's fraud claim, only conduct that "proximately" results in injury in Colorado is sufficient to create personal jurisdiction in this state. *Wenz,* 55 F.3d at 1508; *see also Keefe,* 40 P.3d at 1270 ("[F]oreseeability in this context, however, is not merely the foreseeability of causing injury in another state. The foreseeability that is critical to the due process analysis necessarily requires that the defendant's 'conduct and connection' with the forum state be such that he should reasonably anticipate being haled into court there.") (internal citations omitted). More importantly, under Colorado law, "the place of the injury is the place where the tort is committed under the long-arm statute." *McAvoy v. District Court in and for the City and County of Denver,* 757 P.2d 633, 635 (Colo.1988). Given plaintiff's apparent theory of fraud--that defendants falsely represented they would pay the invoices--the tort was committed in Great Britain, where defendants received but refused to pay for the products. The mere fact that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

453 F.3d 1151                                                                                       Page 1

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily Journal D.A.R. 9121

(Cite as: 453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)))

C
United States Court of Appeals,
Ninth Circuit.
PEBBLE BEACH COMPANY, a California
General Partnership, Plaintiff-Appellant,
v.
Michael CADDY, an individual,
Defendant-Appellee.
No. 04-15577.

Argued and Submitted April 5, 2006.
Filed July 12, 2006.

**Background:** Operator of "Pebble Beach" golf resort brought trademark infringement and trademark dilution action against operator of a British bed and breakfast. The United States District Court for the Northern District of California, Phyllis J. Hamilton, J., granted defendant's motion to dismiss for lack of personal jurisdiction, and plaintiff appealed.

**Holdings:** The Court of Appeals, Trott, Circuit Judge, held that:
(1) defendant's use of "Pebble Beach" in passive website advertising his services and in the website's domain name were not acts aimed at the state of California, and thus were insufficient to subject him to personal jurisdiction there, and
(2) defendant's acts were insufficient to subject him to personal jurisdiction under the federal long-arm rule.
Affirmed.

West Headnotes

**[1] Federal Courts ⊂⊃776**
170Bk776 Most Cited Cases
Court of Appeals reviews de novo the district court's determination that it does not have personal jurisdiction over defendant.

**[2] Federal Courts ⊂⊃820**
170Bk820 Most Cited Cases
Court of Appeals reviews a district court's decision to grant or deny discovery on jurisdictional facts for abuse of discretion.

**[3] Federal Courts ⊂⊃96**
170Bk96 Most Cited Cases
When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant; however, this demonstration requires that the plaintiff make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss.

**[4] Federal Courts ⊂⊃96**
170Bk96 Most Cited Cases
For the purpose of plaintiff's demonstration that court has personal jurisdiction over defendant, the court resolves all disputed facts in favor of the plaintiff.

**[5] Federal Courts ⊂⊃417**
170Bk417 Most Cited Cases
Generally, personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process.

**[6] Constitutional Law ⊂⊃3964**
92k3964 Most Cited Cases
    (Formerly 92k305(5))
For due process to be satisfied, a defendant, if not present in the forum, must have minimum contacts with the forum state such that the assertion of jurisdiction does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14.

**[7] Federal Courts ⊂⊃76.5**
170Bk76.5 Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

453 F.3d 1151                                                                                    Page 2

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily Journal D.A.R. 9121

(Cite as: 453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)))

Minimum contacts test for personal jurisdiction is satisfied when, (1) the defendant has performed some act or consummated some transaction within the forum or otherwise purposefully availed himself of the privileges of conducting activities in the forum, (2) the claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable. U.S.C.A. Const.Amend. 14.

**[8] Federal Courts** ☜76.5
170Bk76.5 Most Cited Cases
To satisfy effects test for purposes of personal jurisdiction, the defendant
must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state. U.S.C.A. Const.Amend. 14.

**[9] Trademarks** ☜1560
382Tk1560 Most Cited Cases
British bed and breakfast operator's use of "Pebble Beach" in passive website advertising his services and in the website's domain name were not acts aimed at the state of California, and thus were insufficient to subject him to personal jurisdiction there in trademark infringement action brought by operator of "Pebble Beach" golf resort; although bed and breakfast operator had formerly lived in California and was familiar with the golf resort, he was not a cybersquatter trying to obtain money from the resort's operator, and did not write a letter to force the resort operator to act.

**[10] Federal Courts** ☜76.5
170Bk76.5 Most Cited Cases
Something more than just a foreseeable effect in the forum state is required to conclude that personal jurisdiction is proper.

**[11] Federal Courts** ☜76.5
170Bk76.5 Most Cited Cases
Internet domain name and passive website alone are not "something more" than foreseeable effect in the forum state, and, therefore, alone are not enough to subject a party to jurisdiction.

**[12] Constitutional Law** ☜3964
92k3964 Most Cited Cases
   (Formerly 92k305(5))

**[12] Federal Courts** ☜76.5
170Bk76.5 Most Cited Cases
Exercise of rule establishing territorial limits of effective service of process as a federal long-arm statute requires the plaintiff to prove three factors: first, the claim against the defendant must arise under federal law; second, the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction; third, the federal court's exercise of personal jurisdiction must comport with due process. U.S.C.A. Const.Amend. 14; Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

**[13] Trademarks** ☜1560
382Tk1560 Most Cited Cases
British bed and breakfast operator's use of "Pebble Beach" in passive website advertising his services and in the website's domain name were not actions purposefully directed at the United States, and thus were insufficient to subject him to personal jurisdiction under the federal long-arm rule in trademark infringement action brought by operator of "Pebble Beach" golf resort; although the bed and breakfast was located in an area frequented by Americans, and occasionally serviced Americans, there was no evidence that such patronage was related to either operator's choice of a domain name or the posting of a passive website. Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

**[14] Federal Courts** ☜76.5
170Bk76.5 Most Cited Cases
Selection of a particular domain name is insufficient by itself to confer jurisdiction over a non-resident defendant, even under the federal long-arm rule, where the forum is the United States. Fed.Rules Civ.Proc.Rule 4(k)(2), 28 U.S.C.A.

**[15] Federal Courts** ☜97
170Bk97 Most Cited Cases
Where a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

453 F.3d 1151                                                                                    Page 3

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily Journal D.A.R. 9121

(Cite as: 453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)))

the defendants, the court need not permit even limited discovery.

[16] Federal Courts ☞76.5
170Bk76.5 Most Cited Cases
Passive website and domain name are an insufficient basis for asserting personal jurisdiction.

Trademarks ☞1800
382Tk1800 Most Cited Cases
Pebble Beach.
*1153 Stephen M. Trattner, Washington, DC, for the plaintiff-appellant.

Mikal J. Condon, Boies, Schiller & Flexner LLP, Oakland, CA, for the defendant-appellee.

Appeal from the United States District Court for the Northern District of California; Phyllis J. Hamilton, District Judge, Presiding. D.C. No. CV-03-04550-PJH.

Before: SCHROEDER, Chief Judge, TROTT and KLEINFELD, Circuit Judges.

TROTT, Circuit Judge:

**1 Pebble Beach Company ("Pebble Beach"), a golf course resort in California, appeals the dismissal for lack of jurisdiction of its complaint against Michael Caddy ("Caddy"), a small-business owner located in southern England. In addition, Pebble Beach seeks review of an order denying its request for an opportunity to conduct jurisdictional discovery. Because Caddy did not expressly aim his conduct at California or the United States, we hold that the district court determined correctly that it lacked personal jurisdiction. Given the nature of the claims and the facts of this case, we conclude also that the district court properly exercised its discretion by denying Pebble Beach's motion to conduct additional jurisdictional discovery. Thus, we affirm.

                                I
Pebble Beach is a well-known golf course and resort located in Monterey County, California. The

golf resort has used "Pebble Beach" as its trade name for 50 years. Pebble Beach contends that the trade name has acquired secondary meaning in the United States and the United Kingdom. Pebble Beach operates a website located at www.pebblebeach.com.

Caddy, a dual citizen of the United States and the United Kingdom occupies and runs a three-room bed and breakfast, restaurant, and bar located in southern England. Caddy's business operation is located on a cliff overlooking the pebbly beaches of England's south shore, in a town called Barton-on-Sea. The name of Caddy's operation is "Pebble Beach," which, given its location, is no surprise. Caddy advertises his services, which do not include a golf course, at his website, www.pebblebeach-uk.com. Caddy's website includes general information about the accommodations he provides, including lodging rates in pounds sterling, a menu, and a wine list. The website is not interactive. Visitors to the website who have questions *1154 about Caddy's services may fill out an on-line inquiry form. However, the website does not have a reservation system, nor does it allow potential guests to book rooms or pay for services on-line.

Except for a brief time when Caddy worked at a restaurant in Carmel, California, his domicile has been in the United Kingdom.

On October 8, 2003, Pebble Beach sued Caddy under the Lanham Act and the California Business and Professions Code for intentional infringement and dilution of its "Pebble Beach" mark. Caddy moved to dismiss the complaint for lack of personal jurisdiction and insufficiency of service of process. On March 1, 2004, the district court granted Caddy's motion on personal jurisdiction grounds, without addressing the insufficiency of service of process issue. The district court denied also Pebble Beach's request for additional discovery. Pebble Beach timely appealed to the Ninth Circuit.

                                II
[1][2] We review de novo the district court's

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

453 F.3d 1151                                                                                    Page 4

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily Journal D.A.R. 9121

(Cite as: 453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)))

determination that it does not have personal jurisdiction over Caddy. *See Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir.2004). We review a district court's decision to grant or deny discovery on jurisdictional facts for abuse of discretion. *Cheng v. Boeing Co.,* 708 F.2d 1406, 1412 (9th Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983).

A. Personal Jurisdiction

**2 The arguments are straight forward. Caddy contends that the district court may not assert personal jurisdiction over him, and, consequently, that the complaint against him was properly dismissed. Pebble Beach argues in return that Caddy is subject to specific personal jurisdiction in California, or, alternatively, in any forum in the United States, because he has expressly aimed tortious conduct at California and the United States. [FN1] Pebble Beach asserts that it may look to the entire United States as a litigation forum pursuant to Federal Rule of Civil Procedure 4(k)(2) if Caddy's contacts with California are insufficient to warrant jurisdiction. As explained more thoroughly below, Rule 4(k)(2) may, in limited circumstances, be a basis for establishing jurisdiction where "the United States serves as the relevant forum for a minimum contacts analysis." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1126 (9th Cir.2002).

> FN1. Caddy's contacts with California or the United States are not continuous or substantial enough to establish general jurisdiction. *See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1125 (9th Cir.2002) Thus, we consider only the question of whether Caddy's contacts are sufficient to establish specific jurisdiction.

[3][4] When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant. *See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1128-29 (9th Cir.2003). However, this demonstration requires that the plaintiff "make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Doe v. Unocal,* 248 F.3d 915, 922 (9th Cir.2001) (internal citations omitted). Moreover, for the purpose of this demonstration, the court resolves all disputed facts in favor of the plaintiff, here, Pebble Beach. *Id.*

[5] The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process. *1155Fireman's Fund Ins. Co. v. Nat. Bank of Coops.,* 103 F.3d 888, 893 (9th Cir.1996). Here, both the California long-arm statute and Rule 4(k)(2)--what is often referred to as the federal long-arm statute--require compliance with due process requirements. See *Harris Rutsky,* 328 F.3d at 1129 (California long-arm statute); *Unocal,* 248 F.3d at 922 (applying Rule 4(k)(2) as a federal long-arm statute). Consequently, under both arguments presented by Pebble Beach, resolution turns on due process.

[6] For due process to be satisfied, a defendant, if not present in the forum, must have "minimum contacts" with the forum state such that the assertion of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

[7] In this circuit, we employ the following three-part test to analyze whether a party's "minimum contacts" meet the Supreme Court's directive. This "minimum contacts" test is satisfied when,

  (1) the defendant has performed some act or consummated some transaction within the forum or otherwise purposefully availed himself of the privileges of conducting activities in the forum, (2) the claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable.

**3 *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000). "If any of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

453 F.3d 1151                                                                                                Page 5

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily Journal D.A.R. 9121

**(Cite as: 453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)))**

the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 270 (9th Cir.1995). The plaintiff bears the burden of satisfying the first two prongs of the "minimum contacts" test. *Schwarzenegger,* 374 F.3d at 802 (internal citations omitted). Here, Pebble Beach's arguments fail under the first prong. Accordingly, we need not address whether the claim arose out of or resulted from Caddy's forum-related activities or whether an exercise of jurisdiction is reasonable per the factors outlined by the Supreme Court in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476-77, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

Under the first prong of the "minimum contacts" test, Pebble Beach has the burden of establishing that Caddy "has performed some act or consummated some transaction within the forum or otherwise purposefully availed himself of the privileges of conducting activities in the forum." *Bancroft,* 223 F.3d at 1086. We have refined this to mean whether Caddy has either (1) "purposefully availed" himself of the privilege of conducting activities in the forum, or (2) "purposefully directed" his activities toward the forum. *Schwarzenegger,* 374 F.3d at 802. Although we sometimes use the phrase "purposeful availment" to include both purposeful availment and direction, "availment and direction are, in fact, two distinct concepts." *Id.*

Thus, in order to satisfy the first prong of the "minimum contacts" test, Pebble Beach must establish either that Caddy (1) purposefully availed himself of the privilege of conducting activities in California, or the United States as a whole, or (2) that he purposefully directed its activities toward one of those two forums. *Id.*

**1. Purposeful Availment**

Pebble Beach fails to identify any conduct by Caddy that took place in California or in the United States that adequately supports the availment concept. Evidence of availment is typically action

taking place in the forum that invokes the benefits and protections of the laws in the forum. *Id.* at 803. Evidence of direction generally consists of action taking place outside the forum that is directed at the forum. *Id.* (suggesting evidence of purposeful direction *1156 includes activities such as distribution and advertising). All of Caddy's action identified by Pebble Beach is action taking place outside the forum. Thus, if anything, it is the type of evidence that supports a purposeful direction analysis. Accordingly, we reject Pebble Beach's assertion that Caddy has availed himself of the jurisdiction of the district court under both concepts and proceed only to determine whether Caddy has purposefully directed his action toward one of two applicable forums.

**2. Purposeful Direction: California**

[8][9] In *Calder v. Jones,* the Supreme Court held that a foreign act that is both aimed at and has effect in the forum satisfies the first prong of the specific jurisdiction analysis. 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). We have commonly referred to this holding as the "*Calder* effects test." *See, e.g., Bancroft,* 223 F.3d at 1087. To satisfy this test the defendant "must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." *Id.* at 1087 (citing *Panavision Int'l v. Toeppen,* 141 F.3d 1316, 1321 (9th Cir.1998)). However, referring to the *Calder* test as an "effects" test can be misleading. For this reason, we have warned courts not to focus too narrowly on the test's third prong--the effects prong--holding that "something more" is needed in addition to a mere foreseeable effect. *Bancroft,* 223 F.3d at 1087. Specifically we have stated,

**4 Subsequent cases have struggled somewhat with *Calder's* import, recognizing that the case cannot stand for the broad proposition that a foreign act with foreseeable effects in the forum state will always give rise to specific jurisdiction. We have said that there must be "something more".... We now conclude that "something more" is what the Supreme Court described as

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

453 F.3d 1151                                                                                          Page 6

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily
Journal D.A.R. 9121

(Cite as: 453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)))

"express aiming" at the forum state.
*Id.* Thus, the determinative question here is whether Caddy's actions were "something more"--precisely, whether his conduct was expressly aimed at California or alternatively the United States.

We conclude that Caddy's actions were not expressly aimed at California. The only acts identified by Pebble Beach as being directed at California are the website and the use of the name "Pebble Beach" in the domain name. These acts were not aimed at California and, regardless of foreseeable effect, are insufficient to establish jurisdiction.

In support of its contention that Caddy has expressly aimed conduct at California, Pebble Beach identifies a list of cases where we have found that a defendant's actions have been expressly aimed at the forum state sufficient to establish jurisdiction over the defendant. Pebble Beach asserts that these cases show that Caddy's website and domain name, coupled with his knowledge of the golf resort as a result of his working in California, are sufficient to satisfy the express aiming standard that it is required to meet. We disagree. If anything, these cases establish that "something more"--the express aiming requirement--has not been met by Pebble Beach.

In *Panavision*, the defendant, a cybersquatter, registered the plaintiff's trademark as part of a domain name. 141 F.3d at 1318-19. The use of the domain name by the defendant prevented the plaintiff from registering its own domain name and was part of a plan to obtain money from the plaintiff in exchange for the rights to the domain name. *Id.* The court found personal jurisdiction, not merely because of the domain name, but because the plan was expressly aimed at the plaintiff:

[The Defendant] did considerably more than simply register Panavision's trademarks **1157** as his domain names on the Internet. He registered those names as part of a scheme to obtain money from Panavision. Pursuant to that scheme, he demanded $13,000 from Panavision to release the

domain names to it. His acts were aimed at Panavision in California, and caused it to suffer injury there.
*Id.* at 1318.

Here, Caddy has hatched no such plan directed at Pebble Beach. He is not a cybersquatter trying to obtain money from Pebble Beach. His operation is legitimate and his website relates directly to that end.

In *Metropolitan Life Insurance Co. v. Neaves*, similar to *Panavision*, the defendant's alleged plan to defraud the insurance company involved direct interaction with the forum state. 912 F.2d 1062 (1990). We held that the action at issue satisfied *Calder's* "effects test" because the defendant sent a letter to the forum state addressed to the plaintiff, thereby defrauding a forum state entity. *Id.* at 1065.

**5** In *Bancroft & Masters, Inc. v. Augusta National Inc.*, a dispute over the domain name *www.masters.org* was triggered by a letter sent by Augusta that required Bancroft & Masters, a computer corporation in California, to sue or lose the domain name. 223 F.3d 1082 (9th Cir.2000). We stated that the "expressly aiming" standard was satisfied when "individualized targeting was present." *Id.* at 1088. We reasoned that specific jurisdiction was proper and that the expressly aiming requirement was satisfied because the letter sent by Augusta constituted "individualized targeting." *Id.*

The defendant in both *Bancroft* and *Metropolitan Life* did "something more" than commit a "foreign act with foreseeable effects in the forum state." *Id.* at 1087. In both cases this "individualized targeting" was correspondence that was a clear attempt to force the plaintiff to act. Here, Caddy engaged in no "individualized targeting." There is no letter written by Caddy forcing Pebble Beach to act. The only substantial action is a domain name and non-interactive informative web site along with the extraneous fact that Caddy had worked, at some point in his past, in California. This does not constitute "individualized targeting." Indeed, to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

453 F.3d 1151                                                                                                    Page 7

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily Journal D.A.R. 9121

(Cite as: 453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)))

hold otherwise would be contrary to what we have suggested in earlier case law.

In *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir.2000), we cited *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418- 20 (9th Cir.1997), for the proposition that when a "website advertiser [does] nothing other than register a domain name and post an essentially passive website" and nothing else is done "to encourage residents of the forum state," there is no personal jurisdiction. Similarly, in *Panavision* we stated, "We agree that simply registering someone else's trademark as a domain name and posting a web site on the Internet is not sufficient to subject a party domiciled in one state to jurisdiction in another." 141 F.3d at 1322. Why? Because "the objectionable webpage simply was not aimed intentionally at the [forum state] knowing that harm was likely to be caused there," and "[u]nder the effects doctrine, 'something more' was required to indicate that the defendant purposefully directed its activity in a substantial way to the forum state." *Rio Properties*, 284 F.3d at 1020 (citing *Cybersell, Inc.*, 130 F.3d at 418, 420) (internal quotation marks omitted). [FN2]

> FN2. In *Rio Properties* it was shown that the defendant did more than just put up a passive website. *Id.* at 1021. Indeed, the defendant was actively competing with the plaintiff by targeting Nevada consumers with radio and print media. *Id.* Accordingly, in *Rio Properties* there was no doubt that action was expressly directed at Nevada and that jurisdiction was proper.

*1158 [10][11] These cases establish two salient points. First, there can be no doubt that we still require "something more" than just a foreseeable effect to conclude that personal jurisdiction is proper. *Bancroft*, 223 F.3d at 1087. Second, an internet domain name and passive website alone are not "something more," and, therefore, alone are not enough to subject a party to jurisdiction. *Rio Properties*, 284 F.3d at 1020; *Panavision*, 141 F.3d at 1322.

In contrast to those cases where jurisdiction was proper because "something more" existed, the circumstances here are more analogous to *Schwarzenegger v. Fred Martin Motor Co.* 374 F.3d 797 (9th Cir.2004). In *Schwarzenegger*, we determined that personal jurisdiction based solely on a non-interactive print advertisement would be improper. *Id.* at 807. In *Schwarzenegger*, the former movie star and current California governor, brought an action in California alleging that an Ohio car dealership used impermissibly his "Terminator" image in a newspaper advertisement in Akron, Ohio. *Id.* at 800. The federal district court in California dismissed the complaint for lack of personal jurisdiction. *Id.* Applying the *Calder* "effects test," we affirmed, concluding that even though the advertisement might lead to eventual harm in California this "foreseeable effect" was not enough because the advertisement was expressly aimed at Ohio rather than California. *Id.* at 807. We concluded that, without "something more" than possible effect, there was simply no individualized targeting of California, or the type of wrongful conduct, that could be construed as being directed at the forum state. *Id.* We held that Schwarzenegger had not established jurisdiction over the car dealership.

**6 Pebble Beach, like Schwarzenegger, relies almost exclusively on the possible foreseeable effects. Like Schwarzenegger, Pebble Beach's arguments depend on the possible effects of a non-interactive advertisement--here, Caddy's passive website. Notably absent in both circumstances is action that can be construed as being expressly aimed at California. The fact that Caddy once lived in California and therefore has knowledge of the Pebble Beach golf resort goes to the foreseeable effect prong of the "effects test" and is not an independent act that can be interpreted as being expressly aimed at California. Consistent with the dicta of *Cybersell, Panavision*, and *Rio Properties*, we reject also any contention that a passive website constitutes expressed aiming. Thus, today, we extend the holding of *Schwarzenegger* to the situations described in *Panavision* and *Rio Properties*, where the sole basis for asserting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

453 F.3d 1151                                                                                    Page 8

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily Journal D.A.R. 9121

**(Cite as: 453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)))**

jurisdiction is a non-interactive passive website. As with the print advertisement in Schwarzenegger, the fact that Caddy's website is not directed at California is controlling.

**3. Purposeful Direction: United States**

Even if Pebble Beach is unable to show purposeful direction as to California, Pebble Beach can still establish jurisdiction if Caddy purposefully directed his action at the United States. This ability to look to the aggregate contacts of a defendant with the United States as a whole instead of a particular state forum is a product of Rule 4(k)(2). [FN3] *See* *1159Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1126 (9th Cir.2002). Thus, Rule 4(k)(2) is commonly referred to as the federal long-arm statute. *Id.*

> FN3. Rule 4(k)(2) provides in whole,
> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

[12] The exercise of Rule 4(k)(2) as a federal long-arm statute requires the plaintiff to prove three factors. *Id.* First, the claim against the defendant must arise under federal law. *Id.* Second, the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction. Third, the federal court's exercise of personal jurisdiction must comport with due process. *Id.* Here, the first factor is satisfied because Pebble Beach's claims arises under the Lanham Act. And, as established above, the second factor is satisfied as Caddy is not subject to personal jurisdiction of California, or any state court.

[13] That leaves the third factor--due process. The due process analysis is identical to the one discussed above when the forum was California, except here the relevant forum is the entire United States. And, as with the foregoing analysis, our resolution here depends on whether Caddy's actions were purposefully directed at the United States. Pebble Beach contends that the "purposeful direction" requirement is satisfied under the *Calder* "effects test" because Caddy's operation is expressly aimed at the United States. Pebble Beach makes four arguments.

First, Pebble Beach claims that because Caddy selected a ".com" domain name it shows that the United States was his "primary" market and that he is directly advertising his services to the United States. Second, Pebble Beach asserts that his selection of the name "Pebble Beach" shows the United States is his primary target because "Pebble Beach" is a famous United States trademark. Third, Pebble Beach asserts that Caddy's intent to advertise to the United States is bolstered by the fact that Caddy's facilities are located in a resort town that caters to foreigners, particularly Americans. Finally, Pebble Beach asserts that a majority of Caddy's business in the past has been with Americans.

**7 [14] As before, Pebble Beach's arguments focus too much on the effects prong and not enough on the "something more" requirement. First, following the rationale articulated in *Cybersell, Rio Properties,* and *Panavision,* we conclude that the selection of a particular domain name is insufficient by itself to confer jurisdiction over a non-resident defendant, even under Rule 4(k)(2), where the forum is the United States. The fact that the name "Pebble Beach" is a famous mark known world-wide is of little practical consequence when deciding whether action is directed at a particular forum via the world wide web. Also of minimal importance is Caddy's selection of a ".com" domain name instead of a more specific United Kingdom or European Union domain. To suggest that ".com" is an indicator of express aiming at the United States is even weaker than the counter assertion that having "U.K." in the domain name, which is the case here, is indicative that Caddy was only

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

453 F.3d 1151                                                                                     Page 9

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily Journal D.A.R. 9121

**(Cite as: 453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)))**

targeting his services to the United Kingdom. Neither provides much more than a slight indication of where a website may be located and does not establish to whom the website is directed. Accordingly, we reject these arguments.

This leaves Pebble Beach's arguments that because Caddy's business is located in an area frequented by Americans, and because he occasionally services Americans, jurisdiction is proper. These arguments fail for the same reasons; they go to effects rather than express aiming. Pebble Beach's arguments do have intuitive appeal--they suggest a real effect on Americans. However, as reiterated throughout this opinion, showing "effect" satisfies only **\*1160** the third prong of the *Calder* test--it is not the "something more" that is required. In *Bancroft,* we stated that foreseeable effects alone are not sufficient to exercise jurisdiction, that "something more" is required and that " 'something more' is what the Supreme Court described as 'express aiming' at the forum state." 223 F.3d at 1087 (internal citations omitted). The "something more" additional requirement is important simply because the effects cited may not have been caused by the defendant's actions of which the plaintiff complains. Here, although Caddy may serve vacationing Americans, there is not a scintilla of evidence indicating that this patronage is related to either Caddy's choice of a domain name or the posting of a passive website. Accordingly, we find no action on the part of Caddy expressly directed at the United States and conclude that an exercise of personal jurisdiction over Caddy would offend due process.

**B. Jurisdictional Discovery**

[15][16] The district court properly exercised its discretion by refusing to grant a continuance to allow Pebble Beach to conduct additional jurisdictional discovery. "[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery...." *Terracom v. Valley Nat. Bank,* 49 F.3d 555, 562

(9th Cir.1995) (citing *Rich v. KIS Cal., Inc.,* 121 F.R.D. 254, 259 (M.D.N.C.1988)). Here, we have rejected Pebble Beach's assertion of personal jurisdiction based on Caddy's chosen domain name and website. As a matter of law, we have concluded that a passive website and domain name are an insufficient basis for asserting personal jurisdiction. Caddy's website is passive, and, therefore, additional discovery on this issue would not be helpful. Furthermore, the record was sufficiently developed for the district court to rule on all remaining issues pertaining to jurisdiction. As a result, there was no need for the district court to grant additional time for discovery.

III

**\*\*8** Caddy did not expressly aim his conduct at California or the United States and therefore is not subject to the personal jurisdiction of the district court. A passive website and domain name alone do not satisfy the *Calder* effects test and there is no other action expressly aimed at California or the United States that would justify personal jurisdiction. Also, the district court exercised properly its discretion by denying additional jurisdictional discovery.

**AFFIRMED.**

453 F.3d 1151, 2006 WL 1897091 (9th Cir.(Cal.)), 81 U.S.P.Q.2d 1081, 06 Cal. Daily Op. Serv. 6260, 2006 Daily Journal D.A.R. 9121

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                Page 1

Slip Copy, 2007 WL 2327590 (D.Utah)

(Cite as: 2007 WL 2327590 (D.Utah))

C
Only the Westlaw citation is currently available.

United States District Court,
D. Utah,
Central Division.
ROLLING THUNDER, LLC, et al., Plaintiffs,
v.
INDIAN MOTORCYCLE INTERNATIONAL,
LLC, Defendant.
No. 2:07-CV-52 TS.

Aug. 10, 2007.
Craig J. Madson, Kyle W. Grimshaw, Madson &
Austin, Salt Lake City, UT, for Plaintiffs.

Heather M. Sneddon, Thomas R. Karrenberg,
Anderson & Karrenberg, Salt Lake City, UT, for
Defendant.

MEMORANDUM DECISION AND ORDER
GRANTING DEFENDANT'S MOTION TO
DISMISS AND
MOOTING MOTION FOR TRANSFER OF
VENUE

TED STEWART, United States District Judge.

*1 This matter is before the Court on Defendant's
Motion to Dismiss [FN1] and Motion to Transfer
Venue. [FN2] Defendant moves to dismiss under
Fed.R.Civ.P. 12(b)(2) for lack of personal
jurisdiction.

FN1. Docket No. 5.

FN2. Docket No. 9.

I. INTRODUCTION
Plaintiff Rolling Thunder is a Washington State
limited liability company. Plaintiff John L. White is
a resident of the State of Washington. Plaintiffs'
counsel is based in Utah. Defendant Indian
Motorcycle International ("IMI") is a Delaware
limited liability company with its principal place of
business in Kings Mountain, North Carolina.

Plaintiffs manufacture and/or distribute
motorcycles, motorcycle engines, and accessories,
under a variety of marks, including the mark
"CRAZY HORSE," "CRAZY HORSE" with a
Native American image logo, and "V-Plus 100."

Defendant seeks to reintroduce to the market, after
years of absence, through manufacture and sell,
motorcycles under the "Indian" name. These
motorcycles are based upon motorcycles of the
same name, made famous in the early 1900s. In
2004, IMI acquired the intellectual property rights
for the Indian motorcycle, including trademarks
relating to the name INDIAN, and the INDIAN
Head Dress trademark.

Throughout 2006, IMI exhanged emails with White
related to his interests in the Indian motorcycle, his
intent to purchase engine parts from a supplier of a
former company that manufactured Indian
motorcycles, his desire to purchase an Indian
motorcycle, and an offer by him to sell his engine
parts to IMI.

However, in January 2007, IMI became aware that
White and Rolling Thunder intended to exhibit an
alleged Indian motorcycle engine, along with a
mark allegedly similar to IMI's INDIAN Head
Dress trademark, at an event in Cincinnati, Ohio.
IMI subsequently sent at least one "cease and
desist" letter to Plaintiffs' counsel in Utah to inform
them of potential infringement. Counsel for
Plaintiffs filed this Utah declaratory judgment
action in response, seeking a judgment solely on the
trademark infringement issue. Plaintiffs
subsequently exhibited the aforementioned engine
and mark.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                Page 2

Slip Copy, 2007 WL 2327590 (D.Utah)

(Cite as: 2007 WL 2327590 (D.Utah))

Defendants now moves for dismissal for lack of personal jurisdiction, or, in the alternative, for a change of venue to the Western District of North Carolina. The Court, having reviewed the memoranda and affidavits, issues the following ruling.

## II. DISCUSSION
*A. Defendant's Motion to Dismiss*

"When the evidence presented on the motion to dismiss consists of affidavits and other written materials [as is the case here], the plaintiff need only make a prima facie showing." [FN3] "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor...." [FN4]

> FN3. *Bell Helicopter Textron, Inc. v. Heliqwest Intern., Ltd.,* 385 F.3d 1291, 1295 (10th Cir.2004).

> FN4. *Kennedy v. Freeman,* 919 F.2d 126, 128 (10th Cir.1990).

" 'To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment.' " [FN5] Similarly, in a federal question case, the federal court must determine "(1) 'whether the applicable statute potentially confers jurisdiction' by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process.' " [FN6] "It is frequently helpful to undertake the due process analysis first, because any set of circumstances that satisfies due process will also satisfy the long-arm statute." [FN7]

> FN5. *Soma Med. Int'l v. Standard Chartered Bank,* 196 F.3d 1292, 1295 (10th Cir.1999) (quoting *Far West Capital, Inc. v. Towne,* 46 F.3d 1071, 1074 (10th Cir.1995)).

> FN6. *Peay v. Bellsouth Med. Assistance Plan,* 205 F.3d 1206, 1209 (10th Cir.2000).

> FN7. *Sys. Designs, Inc. v. New Customward Co.,* 248 F.Supp.2d 1093, 1097 (D.Utah 2003).

*2 To satisfy the constitutional requirement of due process, there must be "minimum contacts" between the defendant and the forum state. [FN8] The "minimum contacts" standard may be met by a finding of either general jurisdiction or specific jurisdiction.

> FN8. *World-Wide Volkswagen Co. v. Woodson,* 444 U.S. 286, 291 (1980).

For general jurisdiction to exist, " 'the defendant must be conducting substantial and continuous local activity in the forum state.' " [FN9] The parties' arguments focus almost exclusively on specific, rather than general personal jurisdiction, and the Court will proceed by examining specific jurisdiction.

> FN9. *Soma,* 196 F.3d at 1295 (quoting *Arguello v. Woodworking Mach. Co.,* 838 P.2d 1120, 1122 (Utah 1992)).

When the "defendant has 'purposely directed' his activities at residents of the forum," courts in that state may exercise specific jurisdiction in cases that "arise out of or relate to those activities." [FN10] In order for the Court to find specific jurisdiction, there must be "some act by which the defendant purposefully avails of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." [FN11] "This requirement of 'purposeful availment' for purposes of specific jurisdiction precludes personal jurisdiction as the result of 'random, fortuitous, or attenuated contacts.' " [FN12]

> FN10. *Burger King v. Rudzewicz,* 471 U.S. 462, 472-73 (1985).

> FN11. *Hanson v. Denckla,* 357 U.S. 235, 253 (1958) (citation omitted).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

FN12. *Bell Helicopter*, 385 F.3d at 1296 (citing *Burger King*, 471 U.S. at 475.)

In addition to minimum contacts, "[a] district court must also consider whether personal jurisdiction is reasonable in light of the circumstances surrounding the case." [FN13]

FN13. *Id.* at 1296 n. 1 "Courts consider the following factors to decide whether exercise of jurisdiction is reasonable: (1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive policies." *Id*

Defendant argues that there is no specific jurisdiction over it for several reasons. First, Defendant argues that it has not purposefully directed activities at residents of Utah. Defendant argues that its only contact with Utah--cease and desist letters--are not sufficient contacts for personal jurisdiction. Defendant acknowledges that, in the past and currently, it maintains a website which is essentially non-interactive in that it does not sell products. Defendant concedes that its website did, at the relevant times in dispute, contain a link to a licensee for the sale of products containing the INDIAN trademarks, as well as the opportunity to place orders for motorcycles which will be produced in the future. However, Defendant argues that a licensee's acts are insufficient to confer jurisdiction upon a licensor. Finally, Defendant argues that, to the extent they exist, any contacts it has made with Utah from its website are not sufficiently related to this action, which arose merely from Defendant's letter to Plaintiffs' Utah-based counsel, not from any activity which occurred from its website, as Plaintiffs seemingly allege.

Plaintiffs make several arguments in response. First, Plaintiffs argue that a licensee's internet sales

can confer jurisdiction. Second, Plaintiffs generally argue that Defendant's assertion of trademark rights is inconsistent with Defendant's position that acts by a licensee cannot confer jurisdiction. [FN14] Third, Plaintiffs argue that a user of Defendant's website would not know from following its link that the purchase of trademarked items was not from Defendant. Fourth, Plaintiffs argue that Defendant's website is fully interactive, able to take money and send emails, among other things. Finally, Plaintiffs argue that a sufficient nexus exists between Defendant's contacts and Plaintiffs' allegations because "they relate to sales and advertising of goods bearing the 'INDIAN' marks in Utah." [FN15]

FN14. Plaintiff cites no authority for this proposition.

FN15. Docket No. 10, at 11.

*3 The Court finds that, even resolving contested facts in favor of Plaintiffs, personal jurisdiction does not exist over Defendant. As a general rule, purposeful availment, and subsequently, jurisdiction in internet contact cases is measured along a sliding scale which depends on the level of interactivity and commercial nature of the exchange of information that occurs on the website. [FN16] However, the Court need not examine the interactivity of Defendant's website in detail here because the Court finds that, even if purposeful availment existed, the fact that Plaintiffs' declaratory judgment claim regarding trademark infringement does not arise out of or result from the asserted forum-related activities of Defendant is dispositive of the personal jurisdiction issue.

FN16. *Xactware, Inc., v. Symbility Solution, Inc.*, 402 F.Supp.2d 1359, 13 63-64 (D.Utah 2005) (citing, among other cases, *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1123-24 (W.D.Pa.1997)).

A nexus must exist between a defendant's forum-related contacts and the Plaintiffs' cause of action. [FN17] This is not satisfied when Plaintiffs

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2007 WL 2327590 (D.Utah)

**(Cite as: 2007 WL 2327590 (D.Utah))**

would have suffered the same injury even if none of the Defendant's forum contacts had taken place. [FN18] Here, Plaintiffs' claimed injury is the potential restriction on the use of their trademarks and/or a suit for infringement. Plaintiffs essentially seek a declaration of non-infringement. This "injury" is in nowise related to Defendant's website contacts. In other words, Plaintiffs would be in the same predicament absent Plaintiffs' website.

> FN17. *TH Agriculture & Nutrition, LLC v. Ace European Group Ltd.,* 488 F.3d 1282, 1291-92 (10th Cir.2007).

> FN18. *Beverly Kuenzle, Wayne Kuenzle v. HTM Sport-Und Freizeitgerate AG,* 102 F.3d 453, 456-57 (10th Cir.1996).

Given the above, the Court is left with determining whether Defendant's cease and desist letter is sufficient to establish jurisdiction. Cease and desist letters in this context are not sufficient grounds for a finding of personal jurisdiction as they are too attenuated. [FN19]

> FN19. *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.,* 148 F.3d 1355, 1361 (Fed.Cir.1998); *Overstock. com, Inc. v. Furnace Brook, LLC,* 420 F.Supp.2d 1217, 1219-21 (D.Utah 2005).

Finally, the Court finds that given the dearth of minimum contacts, the fact that Defendant's website activities are unrelated to Plaintiffs' cause of action, and considering the other abovementioned facts under the appropriate factors, personal jurisdiction is not reasonable in light of the circumstances surrounding the case. Accordingly, the Court will grant Defendant's Motion to Dismiss.

*B. Defendant's Motion to Transfer Venue*

Because the Court will grant Defendant's Motion to Dismiss, Defendant's Motion to Transfer Venue is moot.

### III. CONCLUSION
For the foregoing reasons, it is therefore

ORDERED that Defendants' Motion to Dismiss (Docket No. 5) is GRANTED. It is further

ORDERED that Defendant's Motion to Transfer Venue (Docket No. 9) is DENIED AS MOOT. The Clerk of the Court shall close this case forthwith.

Slip Copy, 2007 WL 2327590 (D.Utah)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                           Page 1

Not Reported in F.Supp.2d, 2007 WL 433368 (D.N.H.), 2007 DNH 15

(Cite as: 2007 WL 433368 (D.N.H.))

c
NOT FOR PUBLICATION


United States District Court,
D. New Hampshire.
MULTI TECHNOLOGY INDUSTRIAL, LLC,
Plaintiff
v.
HUHTAMAKI FORCHHEIM f/k/a 4P Folie
Forchheim, Defendant.
Civil No. 05-cv-403-SM.

Feb. 7, 2007.

Arnold Rosenblatt, Cook Little Rosenblatt &
Manson PLLC, Daniel J. Bourque, Bourque &
Associates PA, Manchester, NH, for Plaintiff.

Jamie N. Hage, Nixon Peabody LLP, Manchester,
NH, for Defendant.

### ORDER

STEVEN J. McAULIFFE, Chief Judge.

**\*1** Multi Technology Industrial, LLC ("MTI")
brought suit seeking a declaration that it is not
infringing a patent held by the defendant,
Huhtamaki Forchheim. [FN1] *See* 28 U.S.C. § 2201
. Huhtamaki moves to dismiss, arguing that the
court lacks personal jurisdiction over it and that
venue in this district is improper. *See* Fed.R.Civ.P.
12(b)(2) and 12(b)(3). MTI objects.

> FN1. The defendant's correct name is
> unclear. Plaintiff claims that
> correspondence it received from the
> defendant was from Huhtamaki
> Forchheim, while defendant asserts that its
> legal name is Huhtamaki Deutschland
> GmbH & Co. KG. Because neither party
> believes the distinction is relevant to the
> present motion, the court refers to the

defendant in this case as "Forchheim."

### STANDARD OF REVIEW
"The issue of personal jurisdiction in a declaratory
action for non-infringement is 'intimately related to
patent law' and thus governed by Federal Circuit
law regarding due process." *Breckenridge Pharm.,
Inc. v. Metabolite Labs., Inc.,* 444 F.3d 1356, 1361
(Fed.Cir.2006) (quoting *Silent Drive, Inc. v. Strong
Indus., Inc.,* 356 F.3d 1192, 1201 (Fed.Cir.2003)).
When "the parties have not conducted discovery,
the plaintiff need[ ] 'only [ ] make a *prima facie*
showing' that the defendants [are] subject to
personal jurisdiction." *Silent Drive, Inc. v. Strong
Indus.,* 326 F.3d 1194, 1201 (Fed.Cir.2003)
(quoting *Deprenyl Animal Health, Inc. v. Univ. of
Toronto Innovations Found.,* 297 F.3d 1343, 1347
(Fed.Cir.2002)) (alterations in original).

### BACKGROUND
The relevant facts, as alleged in the complaint
(document no. 1) are as follows.

MTI, a Delaware limited liability company with its
principal place of business in Brentwood, New
Hampshire, "designs, develops, and manufactures
release liners for use in the construction, automotive
and electronics industries." Forchheim is a German
corporation that manufactures plastic films,
coatings, and silicones.

In April 2005, MTI received a letter from
Forchheim, through its counsel, alleging
infringement of U.S. Patent No. 5,143,676 (the
"676 patent"). MTI's counsel responded, which
resulted in another letter from Forchheim in
October 2005 threatening patent infringement
litigation. This suit followed.

### DISCUSSION
"There are two kinds of personal
jurisdiction--specific and general." *Trintec Indus.
v. Pedre Promotional Prods.,* 395 F.3d 1275, 1279

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2007 WL 433368 (D.N.H.), 2007 DNH 15

**(Cite as: 2007 WL 433368 (D.N.H.))**

(Fed.Cir.2005). MTI asserts that it has met its prima facie burden of showing that Forchheim is subject to personal jurisdiction under either theory.

I. General Personal Jurisdiction

General personal jurisdiction "requires that the defendant have 'continuous and systematic' contacts with the forum state and confers personal jurisdiction even when the cause of action has no relationship with those contacts." *Silent Drive*, 326 F.3d at 1200 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984) ).

MTI argues that Forchheim is subject to general personal jurisdiction in New Hampshire because Huhtamaki Packaging, Inc. ("HPI"), a company that shares common ownership with Forchheim, is registered to do business in the state. The Federal Circuit, however, has found such relationships, without more, an insufficient basis upon which to subject a party to general personal jurisdiction. In *Phonometrics, Inc. v. N. Telecom, Inc.*, 133 F.3d 1459, 1463 (Fed.Cir.1998), the Federal Circuit affirmed a district court ruling finding lack of jurisdiction over a parent corporation where only its subsidiary operated in the forum state. Specifically, **\*2** the [district] court held that [the parent] established that it does not control [the subsidiary] and that it had no offices, employees, or agents in [the forum state], and neither manufactures nor sells equipment in [the forum state], nor otherwise conducts business there, and [the plaintiff] could provide no evidence to refute these facts.

Here, MTI has failed to show that Forchheim has any offices, employees, or agents in New Hampshire, or that it otherwise conducts any business here. To the contrary, the record indicates that aside from one transaction with MTI, Forchheim has never sent its products to New Hampshire or solicited business here, nor does it have any agreements or contracts with New Hampshire-based entities. (Def.'s Mot. Dismiss, Ex. B (Wilde Dec.) ¶¶ 2-4.)

MTI has proffered evidence that HPI, a corporate relative of Forchheim, is registered with the New Hampshire Secretary of State to conduct business here and that HPI has engaged in business transactions in New Hampshire. There is, however, a " 'presumption of corporate separateness that [may] be overcome by clear evidence.' " *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir .1990) (quoting *Escude Cruze v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir.1980)) (alteration in original). In cases where the activity of one separate yet related corporate entity has conferred jurisdiction on another, "there is invariably a 'plus' factor--something beyond the subsidiary's mere presence within the bosom of the corporate family," *id.* at 465-66, such as an agency relationship or some showing of control. *Id.* at 466.

MTI asserts that Forchheim is virtually indistinguishable from HPI because of the company's unified "Huhtamaki" brand identity, and because certain administrative and managerial functions are centralized and serve all of the company's divisions, including Forchheim and HPI.

But MTI has failed to show that aside from sharing a common name and centralized administrative structure, there is any agency relationship between Forchheim and HPI or that Forchheim is controlled by HPI in any way. In short, MTI has failed to demonstrate that Forchheim is sufficiently intertwined with HPI to warrant exercise of general jurisdiction because the evidence does not show that the two entities share something " 'greater than that normally associated with common ownership and directorship." *Donatelli*, 893 F.2d at 466 (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir.1983)). Accordingly, MTI has failed to carry its prima facie burden of showing that this court may exercise general personal jurisdiction over Forchheim.

II. Specific Personal Jurisdiction

In contrast to general personal jurisdiction, specific personal jurisdiction "must be based on activities that 'arise[ ] out of' or 'relate[ ] to' the cause of action and can exist even if the defendant's contacts

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                   Page 3

Not Reported in F.Supp.2d, 2007 WL 433368 (D.N.H.), 2007 DNH 15

(Cite as: 2007 WL 433368 (D.N.H.))

are 'isolated and sporadic.' " *Silent Drive,* 326 F.3d at 1200 (quoting *Burger King Corp. v. Rudzewicz,* 417 U.S. 472, 472-73 (1985)) (alterations in original). "Determining whether jurisdiction exists over an out-of-state defendant involves two inquiries: whether a forum state's long-arm statute permits the assertion of jurisdiction and whether the assertion of personal jurisdiction violates federal due process." *Graphic Controls Corp. v. Utah Med. Prods., Inc.,* 149 F.3d 1382, 1385 (Fed.Cir.1998) (footnote omitted). Where, as here, the "long-arm statute is coextensive with the limits of due process, the two inquiries collapse into a single inquiry: whether jurisdiction comports with due process." *Inamed Corp. v. Kuzmak,* 249 F.3d 1356, 1360 (Fed.Cir.2001); *see Computac, Inc. v.. Dixie News Co.,* 124 N.H. 350, 355 (1983) (explaining that New Hampshire's long-arm statute is "coextensive with constitutional limitations").

*3 The federal due process inquiry requires the nonresident defendant to have "certain 'minimum contacts' with the forum 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *Elecs. for Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1350 (Fed.Cir.2003) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (citations omitted). The Federal Circuit has articulated a three-part test for evaluating minimum contacts: " 'whether (1) the defendant purposefully directed its activities at residents of the forum state, (2) the claim arises out of or relates to the defendant's activities with the forum state, and (3) assertion of personal jurisdiction is reasonable and fair.' " *Pennington Seed, Inc. v. Produce Exch. No. 299,* 457 F.3d 1334, 1344 (Fed.Cir.2006) (quoting *Coyle,* 340 F.3d at 1350).

MTI contends that the cease and desist letters it received from Forchheim satisfy the first prong of the minimum contacts inquiry. The Federal Circuit has held, however, that "without more, such letters are not sufficient to satisfy the requirements of Due Process in declaratory judgment actions," *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.,* 148 F.3d 1355, 1360 (Fed.Cir.1998), and that "[a] patentee should not subject itself to personal jurisdiction in a

forum solely by informing a party who happens to be located there of suspected infringement." *Id.* at 1361. Indeed, the court has observed that "the crux of the due process inquiry should focus first on whether the defendant has had contact with parties in the forum state beyond the sending of cease and desist letters or mere attempts to license the patent at issue." *Brekenridge Pharm. Inc. v. Metabolite Labs. Inc.,* 444 F.3d 1356, 1366 (Fed.Cir.2006).

MTI also argues that Forchheim has had contact with New Hampshire beyond the sending of cease and desist letters--contacts sufficient to meet the heightened standard discussed in *Brekenridge.* But MTI asserts that those additional contacts consist of Forchheim's corporate relationship with HPI, an assertion that fails for the same reasons it failed to justify the exercise of general personal jurisdiction. Exercising specific personal jurisdiction over Forchheim on the basis of the cease and desist letters, without more, would be improper.

MTI points to Forchheim's corporate web site, which, it asserts, "is designed to broadcast and offer for sale into the forum its products and services to customers and prospective users in the forum with the intent of soliciting and establishing business relationships in New Hampshire." (Pl.'s Obj. Mot. Dismiss 15.) The record discloses, however, that the site is fairly general in nature and is not specifically directed at New Hampshire residents. Instead, the site "is available to all customers throughout the country who have access to the Internet." *Trintec Indus.,* 395 F.3d at 1281. The mere fact that New Hampshire residents have access to the site " 'does not by itself show any persistent course of conduct by the defendants' " in New Hampshire. *Id.* (quoting *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1349 (D.C.Cir.2000)). Even if the web site was a sufficient contact upon which to justify exercise of personal jurisdiction, it is of no relevance here, since the present action, involving patent rights, is unrelated to the web site and would thus fail to satisfy the second prong of the minimum contacts analysis. Accordingly, Forchheim's web presence does little to support MTI's position that the exercise of personal jurisdiction over Forchheim is proper in this court.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                Page 4

Not Reported in F.Supp.2d, 2007 WL 433368 (D.N.H.), 2007 DNH 15

**(Cite as: 2007 WL 433368 (D.N.H.))**

*4 Finally, MTI asserts that Forchheim has sufficient contacts with New Hampshire because it markets and sells products in New Hampshire through its corporate affiliate, HPI, with the expectation that such products will be sold, eventually, in New Hampshire. This so-called "stream of commerce theory" is frequently employed in cases where "the defendant's contacts are the result of establishing a distribution network in the forum [s]tate for the sale of defendant's products." *Viam Corp. v. Iowa Export-Import Trading Co.,* 84 F.3d 424, 427 (Fed.Cir.1996). Under the stream of commerce theory, personal jurisdiction is proper against a defendant if it "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum [s]tate." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298 (1980).

MTI's stream of commerce theory fails, however, for the same reasons set forth above. Even if it is true that HPI is engaged in the distribution of products that eventually reach New Hampshire, MTI has failed to establish a sufficient connection between Forchheim and HPI to justify exercise of personal jurisdiction over the former based on the conduct of the latter. *See Donatelli,* 893 F.2d 459, 465-66 (1st Cir.1990).

MTI's claim of personal jurisdiction over Forchheim in this district is based upon the unsupported premise that Forchheim and HPI are so intertwined that, for jurisdictional purposes, they are essentially the same entity. MTI has failed to meet its prima facie burden of demonstrating the existence of personal jurisdiction over Forchheim in this forum. Having found no basis upon which to exercise personal jurisdiction, a discussion of the venue issue is unnecessary.

### CONCLUSION
As the court lacks personal jurisdiction, Forchheim's motion to dismiss (document no. 6) is hereby granted. The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2006 WL 269951 (N.D.Cal.)

**(Cite as: 2006 WL 269951 (N.D.Cal.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
PROTRADE SPORTS, INC., Plaintiff,
v.
NEXTRADE HOLDINGS, INC., Defendant.
No. C05-04039 MJJ.

Feb. 2, 2006.

Lisa Kobialka, Perkins Coie LLP, Menlo Park, CA,
Ramsey M. Al-Salam, Perkins Coie LLP, Seattle,
WA, for Plaintiff.

Geoffrey T. Holtz, Bingham McCutchen LLP, San
Francisco, CA, Richard Edson Fee, Tampa, FL, for
Defendant.

ORDER GRANTING DEFENDANT'S MOTION
TO DISMISS

MARTIN J. JENKINS, J.

INTRODUCTION
*1 Before the Court is NexTrade Holdings Inc.'s
("Defendant", "Nextrade") Motion to Dismiss or in
the Alternative, Transfer. [FN1] The motion is
opposed by Protrade Sports Inc. ("Plaintiff",
"Protrade"). For the following reasons, the Court
GRANTS Defendant's Motion to Dismiss for Lack
of Personal Jurisdiction.

  FN1. Docket No. 8, Filed November 28,
  2006.

FACTUAL BACKGROUND
Defendant Nextrade is a Florida corporation with
its principal place of business in Clearwater Florida.
Nextrade develops technology for electronic
securities markets. Nextrade owns the federally
registered trademark "Pro-Trade" (the "Pro-trade

Mark"). Plaintiff Protrade is a Delaware corporation
which operates an online stock market dealing in
virtual shares of professional athletes in the
fantasy-sports industry.

On October 6, 2005, Plaintiff filed the instant
action seeking a declaratory judgment of
non-infringement of the Pro-Trade mark.

A week after the instant action was filed, Nextrade
filed a similar action in the United States District
Court for the Middle District of Florida (the
"Florida Action"). Like this case, the primary issue
in the Florida action is Protrade's alleged
infringement of Nextrade's Pro-trade Mark. The
Florida court recently stayed the Florida Action
pending the outcome of the instant action.

On November 28, 2005, Defendant filed the instant
motion to dismiss for lack of personal jurisdiction,
pursuant to Fed.R.Civ.P. 12(b)(2).

LEGAL STANDARD
When a defendant moves to dismiss a complaint
for lack of personal jurisdiction pursuant to Federal
Rule of Civil Procedure 12(b)(6), the plaintiff bears
the burden of demonstrating that jurisdiction exists.
*Schwarzenegger v. Fred Martin Motor Co.,* 374
F.3d 797, 800 (9th Cir.2004). If the Court rules on
the motion based on written materials without an
evidentiary hearing, "the plaintiff need only make a
prima facie showing of jurisdictional facts." *Id.* In
such cases, the Court examines whether the
plaintiff's pleadings and affidavits make a prima
facie showing of personal jurisdiction. *Caruth v.
Int'l Psychoanalytical Ass'n,* 59 F.3d 126, 128 (9th
Cir.1995). "Although the plaintiff cannot 'simply
rest on the bare allegations of its complaint,'
uncontroverted allegations in the complaint must be
taken as true." *Schwarzenegger,* 374 F.3d at 800
(internal citations omitted). The Court resolves
conflicts between parties over statements in the
affidavits in the plaintiff's favor. *AT & T,* 94 F.3d at

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 2

Not Reported in F.Supp.2d, 2006 WL 269951 (N.D.Cal.)

(Cite as: 2006 WL 269951 (N.D.Cal.))

588.

A district court sitting in diversity has personal jurisdiction to the extent provided by the law of the forum state. *Data Disc., Inc. v. Sys. Tech. Assocs.,* 557 F.2d 1280, 1286 (9th Cir.1977). California's jurisdictional statute is co-extensive with federal due process requirements; therefore, jurisdictional inquiries under state law and federal due process standards collapse into one, and the Court considers only whether the exercise of jurisdiction over Defendant comports with due process. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir.2002). Specifically, to satisfy constitutional due process, the non-resident defendant "must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.' " *Schwarzenegger,* 374 F.3d at 801 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

ANALYSIS

*2 Depending on a defendant's contacts with California, a court may exercise either general or specific jurisdiction over him. Since it is not clear from Plaintiff's papers whether Plaintiff is asserting that the Court has general or specific jurisdiction over Defendant, the Court will analyze Plaintiff's jurisdictional allegations under each standard.

1. General Jurisdiction

General jurisdiction exists where the defendant's contacts with the forum state are so substantial or continuous and systematic that jurisdiction exists even if the cause of action is unrelated to those contacts. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000). The standard for establishing general jurisdiction is "fairly high." *Id.* Particularly, the defendant's contacts must approximate physical presence in the forum state. *Schwarzenegger,* 374 F.3d at 801. In evaluating the extent of a defendant's contacts, the Court considers whether the defendant mails, solicits, or engages in business, designates an agent for service of process, holds a license, or is

incorporated in the forum state. *Bancroft & Masters, Inc.,* 223 F.3d at 1086.

Defendant is a Florida corporation with its principal place of business in Florida. According to the sworn declaration of Nextrade CEO John Schaible, Nextrade owns no property in California, maintains no inventory, offices, agents, employees, vendors or suppliers in California. (Schaible Decl., ¶ 3-5). Nextrade is not registered to conduct business in California. Although Plaintiff has the burden of establishing general jurisdiction, Plaintiff has asserted little to this effect, save allegations that Defendant has an accessible website and that Defendant "promotes and sells its products nationwide." (Opposition at 4). Given the paucity of Plaintiff's contentions concerning substantial activity between Nextrade and California, it is clear that Plaintiff's allegations fall well short of demonstrating the " 'continuous and systematic' contacts that the Supreme Court and [the Ninth Circuit] have held to constitute sufficient 'presence' to warrant general jurisdiction." *Schwarzenegger,* 374 F.3d at 801.

2. Specific Jurisdiction

Having concluded that the Court does not have general jurisdiction over Defendant, the Court next examines Plaintiff's allegations through the analytical lens of specific jurisdiction. "A court exercises specific jurisdiction where the cause of action arises out of or has a substantial connection to the defendant's contacts with the forum." *Glencore Grain Rotterdam B.V.,* 284 F.3d at 1123. The Court applies a three-part test when assessing specific jurisdiction:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
*3 (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
(3) the exercise of jurisdiction must comport with

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 269951 (N.D.Cal.)

**(Cite as: 2006 WL 269951 (N.D.Cal.))**

fair play and substantial justice, *i.e.*, it must be reasonable.
*Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir.1987); *Bancroft & Masters, Inc.*, 223 F.3d at 1086 (9th Cir.2000). The plaintiff bears the burden of satisfying the first two prongs of the test. *Schwarzenegger*, 374 F.3d at 802. If the plaintiff fails under either prong, the Court must find that personal jurisdiction does not exist in the forum state. *Id.* If the plaintiff satisfies both prongs, the burden shifts to the defendant to "present a compelling case" demonstrating that the exercise of jurisdiction would be unreasonable. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 276-78 (1985)).

Plaintiff, therefore, has the burden of showing that Defendant purposefully conducted, within the forum state of California, activities that involved the Pro-Trade mark. In support of this position, Plaintiff alleges that Defendant has an "interactive website, which directly promotes its products in California and allows California residents to download its Pro-Trade software." (Opposition at 6). Citing *Zippo Mfg. Co. v. Zippo DOT Com*, 952 F.Supp. 1119, 1120-1121 (D.Pa.1997) and similar cases, Plaintiff argues that personal jurisdiction exists because Defendant's website is "designed to solicit customers in the forum." Plaintiff's reliance on *Zippo* is misplaced. Unlike *Zippo*, Plaintiff has provided the Court with only bare allegations of commercial activity in the forum state. [FN2] These contentions are contradicted by evidence from Nextrade that it does not conduct business in California, has received no requests from California residents to download its Pro-Trade software, does not target California residents with its website, and does not send direct mailings or unsolicited emails into California. *Id.* (Schaible, Supp. Decl. at ¶¶ 8, 11, 13). Plaintiff has established little more than the fact that Nextrade has a website which is viewable from within California. The mere fact that a defendant has a website which is accessible by residents in the forum state, without more, is insufficient to establish the necessary minimum contacts for specific personal jurisdiction. See, *Schwarzenegger*, 374 F.3d at 801-802.

FN2. Plaintiff has requested leave to conduct discovery on the issue of personal jurisdiction. Given that Plaintiff has failed to establish any indication that Defendant might be subject to the personal jurisdiction of this Court, the Court finds that discovery would create undue burden and cost for Defendant and would result in a waste of judicial resources. A plaintiff is not entitled to discovery without making a "colorable" showing of personal jurisdiction. *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, (7th Cir.2000) 230 F.3d 934, 946. Since Plaintiff has not done so here, the Court denies Plaintiff's request to conduct discovery on the issue of personal jurisdiction.

Next, Plaintiff contends that Nextrade has distributed its products in California and that the Court has personal jurisdiction on this basis. However, nothing before the Court suggests that this is the case. To the contrary, Nextrade has declared that it does not have any dealers, distributors, or sales representatives in California, and has never received a request to download a trial version of its product from a California resident. (Schaible, Supp. Decl. at ¶¶ 6, 8). Accordingly, the Court finds that it does not have personal jurisdiction over Nextrade on this basis.

*4 Finally, Plaintiff argues that even if Defendant has not sold products to California residents, other factors justify the existence of personal jurisdiction. Plaintiff asserts that Defendant has a "wholly owned subsidiary" in California called NexTrade, Inc., to which Defendant has "almost certainly licensed" its products. (Opposition at 8). Again, the record before the Court contradicts Plaintiff's allegations. It is clear from the evidence that the California corporation that Plaintiff asserts is Nextrade's "wholly owned subsidiary" is an unrelated corporation in an unrelated industry with a similar name. (Schaible, Supp. Decl. at ¶ 5).

Plaintiff has failed to meet its burden in creating a prima-facie showing that Defendant has purposely

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2006 WL 269951 (N.D.Cal.)

**(Cite as: 2006 WL 269951 (N.D.Cal.))**

availed himself of the forum state of California.
Plaintiff's allegations of contacts between Nextrade
and California are unsupported by the evidence.
Accordingly, the Court cannot exercise personal
jurisdiction over defendant and must dismiss this
action.

### CONCLUSION

For the foregoing reasons, the Court GRANTS
Defendant's motion to dismiss for lack of personal
jurisdiction. The clerk is directed to terminate any
pending matters and to close the file.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2006 WL 269951
(N.D.Cal.)

**END OF DOCUMENT**

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT B**

JON MICHAELSON (SBN 83815)
jon.michaelson@klgates.com
BEN BEDI (SBN 172591)
ben.bedi@klgates.com
**KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP**
630 Hansen Way
Palo Alto, California 94304
Telephone: 650.798.6700
Facsimile: 650.798.6701

KEVIN W. KIRSCH  (SBN: 166184)
kirsch@taftlaw.com
DAVID H. WALLACE, *admitted pro hac vice*
dwallace@taftlaw.com
**TAFT, STETTINIUS & HOLLISTER LLP**
425 Walnut St., Suite 1800
Cincinnati, OH 45202
Telephone No.: (513) 381-2838
Facsimile No.: (513) 381-0205

**Attorney for Defendant
TESSERON, LTD.**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| ELECTRONICS FOR IMAGING, INC., <br><br> Plaintiff, <br><br> v. <br><br> TESSERON, LTD., <br><br> Defendant. | Case No. CV07-5534 RS <br><br> **SECOND DECLARATION OF FORREST GAUTHIER IN SUPPORT OF TESSERON'S MOTION TO DISMISS OR TRANSFER** <br><br> Hearing Date:  February 1, 2008 <br> Time:              10:00 a.m. <br> Judge:            Charles R. Breyer |

I, Forrest P. Gauthier, declare as follows:

1.      I am the president and founder of Tesseron, Ltd. ("Tesseron"), an Ohio limited liability company having its principal place of business at 8792 Maineville Rd., Maineville, Ohio 45039.

2.      Before founding Tesseron on October 16, 2000, I was employed by Varis Corporation ("Varis"), an Ohio corporation, from 1993 through 2000.

3.      Varis was located at 7500 Innovation Way, Mason, Ohio 45040.

4.      Varis was owned by a number of venture-capital groups and other individuals.

5.      Varis had numerous employees. I was never the sole employee of Varis.

6.      I owned approximately 35% of the stock of Varis.

7.      Varis suffered financial difficulty in the late 1990s.

8.      In 2001, Tesseron, Ltd. purchased Varis's promissory note from Silicon Valley Bank and foreclosed on the note.

9.      In 2001, as part of the foreclosure, Tesseron conducted a public auction to sell all of Varis's assets.

10.     Through that auction, Tesseron acquired all of Varis's assets, including the intellectual property of Varis.

11.     The intellectual property that Tesseron purchased included the patents formerly owned by Varis.

12.     Varis closed its office when it ceased to operate in 2001.

13.     In 2001, Tesseron sold all of Varis's tangible assets to vLogix, and vLogix assumed all ongoing operations of Varis and began ongoing service and support operations.

14.  Tesseron retained all of the intellectual property of Varis and has developed additional intellectual property.

15.  In 2003, Tesseron licensed certain of its patents to vLogix, including certain of the Varis patents.

16.  I have never been the sole employee of vLogix.

17.  vLogix's contract with George Lithograph ended by 2003, when George Lithograph declared bankruptcy.

18.  I have never owned a residence in California in either San Luis Obispo or Bakersfield.  Some homes in Bakersfield are owned by my relatives.

19.  I am unaware of how the Graphic Communication Department at California Polytechnic State University ("Cal Poly") obtained a Xeikon DCP/50D.

20.  Neither vLogix nor Tesseron is currently receiving revenue from any machine at Cal Poly.

21.  I do not recall vLogix or Tesseron ever receiving revenue from any machine at Cal Poly, but any such revenue would have ceased no later than 1999.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of January, 2008.

Forrest R. Gauthier

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| TESSERON, LTD., | ) Case No. 1:07CV2947 |
| Plaintiff, | ) |
| vs. | ) Judge Kathleen M. O'Malley |
| KONICA MINOLTA BUSINESS SOLUTIONS U.S.A., INC., | ) **ANSWER AND AFFIRMATIVE DEFENSES BY DEFENDANT ELECTRONICS FOR IMAGING, INC. IN RESPONSE TO TESSERON'S FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT** |
| KONICA MINOLTA BUSINESS TECHNOLOGIES, INC., | ) |
| KONICA MINOLTA HOLDINGS, INC., | ) |
| ELECTRONICS FOR IMAGING, INC., | ) **DEMAND FOR JURY TRIAL** |
| RICOH AMERICAS CORP., and | ) |
| RICOH COMPANY, LTD., | ) |
| Defendants. | ) |

Defendant Electronics For Imaging, Inc. ("EFI") answers the First Amended Complaint of Plaintiff, Tesseron, Ltd., ("Tesseron"), as follows:

1

## JURISDICTION AND VENUE

1.       EFI admits that Tesseron purports to bring an action for patent infringement arising under the laws of the United States, 35 U.S.C. § 1, et seq. EFI further admits that Tesseron purports to invoke jurisdiction and venue in this district based upon the provisions of 28 U.S.C. §§ 1331, 1338(a), 35 U.S.C. § 281, and 28 U.S.C. §§ 1391, 1400(b). EFI denies the express or implied allegations in Paragraph 1 of committing any acts of infringement within this district or otherwise.

## PARTIES

2.       EFI is informed and believes that Tesseron is an Ohio limited liability company with its principal place of business in Mainesville, Ohio.

3.       EFI admits that it is a Delaware Corporation with its principal place of business at 303 Velocity Way, Foster City, California 94404.

4.       EFI admits that it makes, uses, sells, offers to sell and/or imports for sale into the United States its Fiery print controllers, including some of the print controllers contained in Paragraph 4. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 4, and on that basis, denies those allegations.

5.       EFI admits that it sells variable data printing components to original equipment manufacturers ("OEMs"), including Ricoh Company, Ltd. ("Ricoh") and Konica Minolta Business Technologies, Inc. ("K-M"). EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 5, and on that basis, denies those allegations.

6.       EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6, and on that basis, denies those allegations.

7.       EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7, and on that basis, denies those allegations.

2

8.      EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8, and on that basis, denies those allegations.

9.      EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9, and on that basis, denies those allegations.

10.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 10, and on that basis, denies those allegations.

11.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11, and on that basis, denies those allegations.

12.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12, and on that basis, denies those allegations.

13.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13, and on that basis, denies those allegations.

14.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14, and on that basis, denies those allegations.

15.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15, and on that basis, denies those allegations.

16.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16, and on that basis, denies those allegations.

17.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17, and on that basis, denies those allegations.

18.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18, and on that basis, denies those allegations.

## FIRST CLAIM FOR RELIEF FOR INFRINGEMENT
## OF UNITED STATES PATENT NO. 6,381,028 B1

19.     No response required to paragraph 19.

20.     EFI admits that United States Patent No. 6,381,028 B1 ("the '028 patent"),
entitled "Method of Utilizing Variable Data Fields with a Page Description Language" was
issued to Tesseron on April 30, 2002. EFI otherwise lacks knowledge or information sufficient
to form a belief as to the truth of the remaining allegations contained in Paragraph 20, and on
that basis, denies those allegations.

21.     EFI lacks knowledge or information sufficient to form a belief as to the truth of
the allegations contained in Paragraph 21, and on that basis, denies those allegations.

22.     EFI denies the express or implied allegations in Paragraph 22 of committing any
acts of infringement. EFI admits that it makes, uses, sells, offers to sell and/or imports for sale
into the United States its Fiery print controllers, including some of the print controllers contained
in Paragraph 22. Upon information and belief, EFI admits that at least some of the products
contained in Paragraph 22 are print controllers that are capable of processing PPML and/or VPS
for variable data printing. EFI otherwise lacks knowledge or information sufficient to form a
belief as to the truth of the remaining allegations contained in Paragraph 22, and on that basis,
denies those allegations.

23.     EFI lacks knowledge or information sufficient to form a belief as to the truth of
the allegations contained in Paragraph 23, and on that basis, denies those allegations.

24.     EFI denies the express or implied allegations in Paragraph 24 of committing any
acts of infringement.

25.     EFI denies the express or implied allegations in Paragraph 25 of committing any
acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as
to the truth of the remaining allegations contained in Paragraph 25, and on that basis, denies
those allegations.

26.     EFI denies the express or implied allegations in Paragraph 26 of committing any
acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as
to the truth of the remaining allegations contained in Paragraph 26, and on that basis, denies
those allegations.

27.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27, and on that basis, denies those allegations.

28.     EFI denies the express or implied allegations in Paragraph 28 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 28, and on that basis, denies those allegations.

29.     EFI denies the express or implied allegations in Paragraph 29 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 29, and on that basis, denies those allegations.

30.     EFI denies the express or implied allegations in Paragraph 30 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 30, and on that basis, denies those allegations.

31.     EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31, and on that basis, denies those allegations.

32.     EFI denies the express or implied allegations in Paragraph 32 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 32, and on that basis, denies those allegations.

33.     EFI denies the express or implied allegations in Paragraph 33 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 33, and on that basis, denies those allegations.

### SECOND CLAIM FOR RELIEF FOR INFRINGEMENT
### OF UNITED STATES PATENT NO. 6,771,387 B2

34.    No response required to paragraph 34.

35.    EFI admits that United States Patent 6,771,387 B2 ("the '387 patent") entitled "Method of Utilizing Variable Data Fields with a Page Description Language" was issued to Tesseron on August 3, 2004.  EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 35, and on that basis, denies those allegations.

36.    EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36, and on that basis, denies those allegations.

37.    EFI admits that the U.S. patent application for the '387 patent was published by the U.S. Patent and Trademark Office on September 5, 2002 as US 2002/122205 A1 ("the '205 published application").

38.    EFI denies the express or implied allegations in Paragraph 38 of committing any acts of infringement.  EFI admits that it makes, uses, sells, offers to sell and/or imports for sale into the United States its Fiery print controllers, including some of the print controllers contained in Paragraph 38.  Upon information and belief, EFI admits that at least some of the products contained in Paragraph 38 are print controllers that are capable of processing PPML and/or VPS for variable data printing.  EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 38, and on that basis, denies those allegations.

39.    EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39, and on that basis, denies those allegations.

40.    EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40, and on that basis, denies those allegations.

41.    EFI denies the express or implied allegations in Paragraph 41 of committing any acts of infringement.

42.    EFI denies the express or implied allegations in Paragraph 42 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 42, and on that basis, denies those allegations.

43.    EFI denies the express or implied allegations in Paragraph 43 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 43, and on that basis, denies those allegations.

44.    EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44, and on that basis, denies those allegations.

45.    EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45, and on that basis, denies those allegations.

46.    EFI denies the express or implied allegations in Paragraph 46 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 46, and on that basis, denies those allegations.

47.    EFI denies the express or implied allegations in Paragraph 47 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 47, and on that basis, denies those allegations.

48.    EFI denies the express or implied allegations in Paragraph 48 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations, and on that basis, denies those allegations.

49.    EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49, and on that basis, denies those allegations.

50.    EFI lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50, and on that basis, denies those allegations.

51.    EFI denies the express or implied allegations in Paragraph 51 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 51, and on that basis, denies those allegations.

52.    EFI denies the express or implied allegations in Paragraph 52 of committing any acts of infringement. EFI otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 52, and on that basis, denies those allegations.

### RESPONSE TO DEMAND FOR JUDGMENT

EFI denies that Tesseron is entitled to any of the relief it has requested based on any of EFI's activities. To the extent that Tesseron's request for relief depend on K-M or Ricoh's use of EFI's products or EFI's activities, EFI denies that Tesseron is entitled to any of the relief it has requested.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### NON-INFRINGEMENT

53.    EFI has not and does not willfully or otherwise infringe, contribute to the infringement of, or actively induce others to infringe, either literally, indirectly, or by application of the doctrine of equivalents, any valid claim of the '028 or '387 patents.

### SECOND AFFIRMATIVE DEFENSE
### INVALIDITY UNDER 35 U.S.C. §§ 101, 102, 103 and 112

54.    One or more of the claims of the '028 and '387 patents are invalid for failure to comply with the conditions for patentability specified in 35 U.S.C. § 101, et seq., including without limitation the requirements in 35 U.S.C. §§ 101, 102, 103, and/or 112.

### THIRD AFFIRMATIVE DEFENSE
### ESTOPPEL

55.    By its prolonged inaction in asserting its rights, Tesseron's claims for relief are barred by the defense of estoppel.

### FOURTH AFFIRMATIVE DEFENSE
### LACHES

56.    Tesseron's claims for patent infringement and/or damages are barred by laches, waiver, and/or acquiescence.

### FIFTH AFFIRMATIVE DEFENSE
### PROSECUTION HISTORY ESTOPPEL

57.    Tesseron is estopped from construing the claims of the '028 and '387 patents in such a way as may cover EFI's activities by reason of, *inter alia*, amendments and/or statements made in and to the United States Patent and Trademark Office during the prosecution of the applications that issued as the patents-in-suit, prior statements made in this or any other Court, prior rulings of this or any other Court, and/or Tesseron's prior conduct.

### SIXTH AFFIRMATIVE DEFENSE
### EQUITABLE ESTOPPEL

58.    Tesseron's illegal and/or misleading conduct with respect to the '028 and '387 patents act as a bar to equitable relief under any cause of action set forth in the Complaint.

### SEVENTH AFFIRMATIVE DEFENSE
### MARKING

59.    Tesseron and/or its licensees have failed to mark articles patented under the '028 and '387 patents in a manner sufficient to give notice under 35 U.S.C. § 287 thereby barring any recovery of damages for the period before Tesseron provided actual notice, if any, of infringement to EFI before commencement of this action.

### EIGHTH AFFIRMATIVE DEFENSE
### FAILURE TO STATE A CLAIM

60.    Tesseron has failed to state a claim upon which relief may be granted.

## NINTH AFFIRMATIVE DEFENSE
## PATENT MISUSE & UNCLEAN HANDS

61.     Tesseron is barred from any relief in this action, and the '028 and '387 patents are unenforceable under the doctrines of unclean hands and/or patent misuse because Tesseron has asserted the '028 and '387 patents with knowledge that at least one claim in each of these patents is invalid.

Respectfully submitted,

Dated:  January 16, 2008

/s/Philip J. Moy Jr.
Philip J. Moy Jr. (0043568)
FAY SHARPE LLP
1100 Superior Avenue, Seventh Floor
Cleveland, OH 44114-2579
Telephone: 216-861-5582
Facsimile: 216-241-1666
E-Mail: pmoy@faysharpe.com

Russell B. Hill (admitted *pro hac vice*)
Jesse D. Mulholland (admitted *pro hac vice*)
Elizabeth Yang (admitted *pro hac vice*)
Mark L. Blake (admitted *pro hac vice*)
HOWREY LLP
4 Park Plaza, Suite 1700
Irvine, CA 92614
Telephone: 949-721-6900
Facsimile: 949-721-6910
Email: hillr@howrey.com
mulhollandj@howrey.com
yange@howrey.com
blakem@howrey.com

Attorneys for Defendant
ELECTRONICS FOR IMAGING, INC.

## DEMAND FOR JURY TRIAL

Defendant EFI hereby demands trial by jury on all issues triable to a jury.

Respectfully submitted,

Dated: January 16, 2008

/s/Philip J. Moy Jr.
Philip J. Moy Jr. (0043568)
FAY SHARPE LLP
1100 Superior Avenue, Seventh Floor
Cleveland, OH 44114-2579
Telephone: 216-861-5582
Facsimile: 216-241-1666
E-Mail: pmoy@faysharpe.com

Russell B. Hill (admitted *pro hac vice*)
Jesse D. Mulholland (admitted *pro hac vice*)
Elizabeth Yang (admitted *pro hac vice*)
Mark L. Blake (admitted *pro hac vice*)
HOWREY LLP
4 Park Plaza, Suite 1700
Irvine, CA 92614
Telephone: 949-721-6900
Facsimile: 949-721-6910
Email: hillr@howrey.com
mulhollandj@howrey.com
yange@howrey.com
blakem@howrey.com

Attorneys for Defendant
ELECTRONICS FOR IMAGING, INC.

### CERTIFICATE OF SERVICE

I hereby certify that, on January 16, 2008, a copy of the foregoing ANSWER AND AFFIRMATIVE DEFENSES BY DEFENDANT ELECTRONICS FOR IMAGING, INC. IN RESPONSE TO TESSERON'S FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Philip J. Moy Jr.
Philip J. Moy Jr. (0043568)
FAY SHARPE LLP
1100 Superior Avenue, Seventh Floor
Cleveland, Ohio 44114-2579
Telephone: 216-861-5582
Facsimile: 216-241-1666
E-Mail: pmoy@faysharpe.com

Attorneys for Defendant
ELECTRONICS FOR IMAGING, INC.

12

CMCSch, Cat07, Vecchiar

## U.S. District Court
## Northern District of Ohio (Cleveland)
## CIVIL DOCKET FOR CASE #: 1:07-cv-02947-KMO

| | |
|---|---|
| Tesseron, Ltd. v. Konica Minolta Business Solutions U.S.A., Inc. et al | Date Filed: 09/26/2007 |
| Assigned to: Judge Kathleen M. O'Malley | Jury Demand: Both |
| Cause: 15:1126 Patent Infringement | Nature of Suit: 830 Patent |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Tesseron, Ltd.**                              represented by **David H. Wallace**
Taft, Stettinius & Hollister - Cleveland
3500 BP Tower
200 Public Square
Cleveland, OH 44114
216-241-2838
Fax: 216-241-3707
Email: dwallace@taftlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**L. Clifford Craig**
Taft, Stettinius & Hollister - Cincinnati
1800 Firstar Tower
425 Walnut Street
Cincinnati, OH 45202-3957
513-381-2838
Fax: 513-381-0205
Email: craigc@taftlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin W. Kirsch**
Taft, Stettinius & Hollister - Cincinnati
1800 Firstar Tower
425 Walnut Street
Cincinnati, OH 45202-3957
513-381-2838
Fax: 513-381-0202
Email: kirsch@taftlaw.com
*ATTORNEY TO BE NOTICED*

**Stephen H. Jett**
Taft, Stettinius & Hollister

3500 BP Tower
200 Public Square
Cleveland, OH 44114
216-241-2838
Fax: 216-241-3707
Email: sjett@taftlaw.com
*ATTORNEY TO BE NOTICED*

**Stephen M. O'Bryan**
Taft, Stettinius & Hollister
3500 BP Tower
200 Public Square
Cleveland, OH 44114-2302
216-241-3141
Fax: 216-241-3707
Email: sobryan@taftlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Konica Minolta Business Solutions U.S.A., Inc.**

represented by **Steven J. Routh**
Hogan & Hartson
555 Thirteenth Street, NW
Washington, DC 20004
202-637-5600
Fax: 202-637-5910
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Konica Minolta Business Technologies, Inc.**

**Defendant**

**Konica Minolta Holdings, Inc.**

**Defendant**

**Electronics for Imaging, Inc.**

represented by **Elizabeth Yang**
Howrey - Irvine
Ste. 1700
4 Park Plaza
Irvine, CA 92614
949-721-6900
Fax: 949-721-6910
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jesse D. Mulholland**

Howrey - Irvine
Ste. 1700
4 Park Plaza
Irvine, CA 92614
949-721-6900
Fax: 949-721-6910
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark L. Blake**
Howrey - Irvine
Ste. 1700
4 Park Plaza
Irvine, CA 92614
949-721-6900
Fax: 949-721-6910
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Russell B. Hill**
Howrey - Irvine
Ste. 1700
4 Park Plaza
Irvine, CA 92614
949-729-3972
Fax: 949-721-6910
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip J. Moy, Jr.**
Fay Sharpe
700 Diamond Bldg.
1100 Superior Avenue
Cleveland, OH 44114
216-861-5582
Fax: 216-241-1666
Email: pmoy@faysharpe.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ricoh Americas Corp.**

**Defendant**

**Ricoh Company, Ltd.**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 09/26/2007 | 1 | **Complaint** with jury demand against Konica Minolta Business Solutions U.S.A., Inc., Konica Minolta Business Technologies, Inc. ( Filing fee 350 |

Northern District of Ohio - Docket Report                                    Page 4 of 6

| | | |
|---|---|---|
| | | receipt number 2652166.). Filed by Tesseron, Ltd.. (Attachments: # <u>1</u> Exhibit 1 - '665 Patent# <u>2</u> Exhibit 2 - Assignment Form Varis to Tesseron# <u>3</u> Exhibit 3 - 9/11/02 Letter# <u>4</u> Exhibit 4 - '153 Patent# <u>5</u> Exhibit 5 - '010 Patent# <u>6</u> Exhibit 6 - '028 Patent# <u>7</u> Exhibit 7 - 568 Patent# <u>8</u> Exhibit 8 - 4/4/03 Letter# <u>9</u> Exhibit 9 - '325 Patent# <u>10</u> Exhibit 10 - 4/18/05 Letter# <u>11</u> Exhibit 11 - '934 Published Application# <u>12</u> Exhibit 12 - '016 Patent# <u>13</u> Exhibit 13 - '681 Published Application# <u>14</u> Exhibit 14 - '387 Patent# <u>15</u> Exhibit 15 - '205 Published Application) (Jett, Stephen) (Entered: 09/26/2007) |
| 09/26/2007 | <u>2</u> | Corporate Disclosure Statement filed by Tesseron, Ltd.. (Jett, Stephen) (Entered: 09/26/2007) |
| 09/27/2007 | | Judge Kathleen M. O'Malley assigned to case. (C,BA) (Entered: 09/27/2007) |
| 09/27/2007 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Vecchiarelli. (C,BA) (Entered: 09/27/2007) |
| 09/27/2007 | <u>3</u> | Magistrate Consent Form issued to counsel. No summons provided, no summons issued. (C,BA) (Entered: 09/27/2007) |
| 10/02/2007 | <u>4</u> | Notice *of Filing and Report on filing or Determination* filed by Tesseron, Ltd.. (Attachments: # <u>1</u> Exhibit A - Report on the Filing or Determination of an Action Regarding a Patent or Trademark)(Jett, Stephen) Modified wording of text on 10/3/2007 (C, Br). (Entered: 10/02/2007) |
| 11/16/2007 | <u>5</u> | Stipulated **Motion** for leave *Waiver and Acceptance of Service and Stipulation for Leave to Plead* filed by Plaintiff Tesseron, Ltd.. Related document(s) <u>1</u> . (Wallace, David) (Entered: 11/16/2007) |
| 12/04/2007 | | **Order** [non-document] entered 12/4/2007 granting defendants' stipulated Motion for leave until 2/15/2008 to respond to complaint (Related Doc # <u>5</u> ). Judge Kathleen M. O'Malley (H,CM) (Entered: 12/04/2007) |
| 12/06/2007 | <u>6</u> | First **Amended complaint** *for Patent Infringement* against Electronics for Imaging, Inc., Ricoh Americas Corp., Ricoh Company, Ltd., Konica Minolta Business Solutions U.S.A., Inc., Konica Minolta Business Technologies, Inc., Konica Minolta Holdings, Inc., filed by Tesseron, Ltd.. (Jett, Stephen) (Entered: 12/06/2007) |
| 12/06/2007 | <u>7</u> | **Case Management Conference Scheduling Order** with case management conference to be held on 1/3/2008 at 03:00 PM at Chambers 16A before Judge Kathleen M. O'Malley. Parties to file position statement prior to conference. Signed by Judge Kathleen M. O'Malley on 12/6/2007. (Attachments: # <u>1</u> Position statement)(H,CM) (Entered: 12/06/2007) |
| 12/11/2007 | <u>8</u> | Praecipe for issuance of original summons filed by Tesseron, Ltd. (Attachments: # <u>1</u> Summons for Ricoh Company, Ltd., # <u>2</u> Summons for Ricoh Americas Corp., # <u>3</u> Summons for Electronics for Imaging, Inc.) (B,B) (Entered: 12/12/2007) |

| 12/11/2007 | | Summons issued on 12/11/2007 for service upon Electronics for Imaging, Inc., Ricoh Americas Corp., Ricoh Company, Ltd. (B,B) (Entered: 12/12/2007) |
|---|---|---|
| 12/11/2007 | 9 | Notice of failure to file electronically, pursuant to Local Rule 5.1(c). Non-compliant document: Praecipe filed by Tesseron, Ltd. Related document(s) 8 . (B,B) (Entered: 12/12/2007) |
| 12/12/2007 | 10 | Notice *of Filing Supplemental Certificate of Service for First Amended Complaint for Patent Infringement* filed by Tesseron, Ltd.. (Attachments: # 1 Exhibit A)(Jett, Stephen) (Entered: 12/12/2007) |
| 12/13/2007 | 11 | Return of Service Executed upon Ricoh Americas Corp. by personal service upon statutory agent on 12/07/07 filed on behalf of Tesseron, Ltd. (Jett, Stephen) (Entered: 12/13/2007) |
| 12/18/2007 | 12 | **Motion** for attorney Mark L. Blake to Appear Pro Hac Vice. Filing fee $ 100, receipt number 06470000000002773949, filed by Defendant Electronics for Imaging, Inc.. (Attachments: # 1 Exhibit A-Affidavit of Mark L. Blake)(Moy, Jr., Philip) (Entered: 12/18/2007) |
| 12/18/2007 | 13 | **Motion** for attorney Russell B. Hill to Appear Pro Hac Vice. Filing fee $ 100, receipt number 06470000000002773968, filed by Defendant Electronics for Imaging, Inc.. (Attachments: # 1 Exhibit A-Affidavit of Russell B. Hill)(Moy, Jr., Philip) (Entered: 12/18/2007) |
| 12/18/2007 | 14 | **Motion** for attorney Jesse D. Mulholland to Appear Pro Hac Vice. Filing fee $ 100, receipt number 06470000000002773981, filed by Defendant Electronics for Imaging, Inc.. (Attachments: # 1 Exhibit A-Affidavit of Jesse D. Mulholland)(Moy, Jr., Philip) (Entered: 12/18/2007) |
| 12/18/2007 | 15 | **Motion** for attorney Elizabeth Yang to Appear Pro Hac Vice. Filing fee $ 100, receipt number 06470000000002773989, filed by Defendant Electronics for Imaging, Inc.. (Attachments: # 1 Exhibit A-Affidavit of Elizabeth Yang)(Moy, Jr., Philip) (Entered: 12/18/2007) |
| 12/19/2007 | 16 | Return of Service Executed upon Electronics for Imaging, Inc. by Personal Service on December 17, 2007 filed on behalf of Tesseron, Ltd. Related document(s) 6 . (Jett, Stephen) (Entered: 12/19/2007) |
| 12/21/2007 | | **Order** [non-document] entered 12/21/2007 granting defendant Electronics Imaging's Motions for attorneys Mark Blake, Russell Hill, Jesse Mulholland and Elizabeth Yang to appear pro hac vice (Related Doc # 12 , 13 , 14 , 15 ). Judge Kathleen M. O'Malley(H,CM) (Entered: 12/21/2007) |
| 12/21/2007 | 17 | Joint **Motion** to continue *Case Management Conference scheduled for 1/3/08* filed by Plaintiff Tesseron, Ltd., Electronics for Imaging, Inc., Konica Minolta Business Solutions U.S.A., Inc., Konica Minolta Business Technologies, Inc., Konica Minolta Holdings, Inc.. Related document(s) 7 , 11 . (Jett, Stephen) (Entered: 12/21/2007) |
| 12/27/2007 | 18 | Joint Proposed Stipulation *Regarding Extension of Time until 1/16/08 for New Defendant Electronics Imaging, Inc. to Answer or Otherwise Plead* |

| | | filed by Electronics for Imaging, Inc.. (Moy, Jr., Philip) Modified on 12/28/2007 (S,R). (Entered: 12/27/2007) |
|---|---|---|
| 12/28/2007 | | **Order** [non-document] entered 12/28/2007 granting Joint Motion to continue (Related Doc # 17 ); case management conference RESET to be held on 2/7/2008 at 12:30 PM at Chambers 16A. Judge Kathleen M. O'Malley (H,CM) (Entered: 12/28/2007) |
| 12/28/2007 | 19 | Stipulated **Motion** for Leave to Plead and Waiver and Acceptance of Service filed by Plaintiff Tesseron, Ltd.. (Kirsch, Kevin) (Entered: 12/28/2007) |
| 01/09/2008 | | **Order** (non-document) entered 1/9/2008 granting parties' stipulation 18 of extension of time until 1/16/2008 for defendant Electronics Imaging to respond to amended complaint; granting parties' 19 Stipulation for extension of time until 2/29/2008 for defendant Ricoh to respond to amended complaint. Judge Kathleen M. O'Malley (H,CM) (Entered: 01/09/2008) |
| 01/16/2008 | 20 | **Answer** to 6 Amended complaint, filed by Electronics for Imaging, Inc.. (Moy, Philip) (Entered: 01/16/2008) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/17/2008 10:33:32 | | |
| **PACER Login:** km0021 | **Client Code:** | TES05 GN013 |
| **Description:** Docket Report | **Search Criteria:** | 1:07-cv-02947-KMO |
| **Billable Pages:** 4 | **Cost:** | 0.32 |